**UNITED STATES of America,**

v.

**Tommy EDELIN, Earl Edelin, Shelton Marbury, Henry Johnson, Marwin Mosley, Bryan Bostick, Defendants.**

**No. CRIM.98–264 (RCL).**

United States District Court, District of Columbia.

Sept. 16, 2003.

James W. Rudasill, Jr., Pleasant S. Brodnax, III, Christopher Michael Davis, Mary Elizabeth Davis, Davis & Davis, Shawn Franklin Moore, Federal Public

Defender for D.C., Jensen Egerton Barber, Law Offices of J.E. Barber, P.C., Jerry Ray Smith, Washington, DC, William W. Kanwisher, Baltimore, MD, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This comes before the Court on Defendant Tommy Edelin's motion for appropriate relief [650], the United States' Response [648], Edelin's reply [667], Bryan Bostick's Supplement [702] and memorandum [707], and Earl Edelin's [666] and Marwin Mosley's [697] motions to join. Also pending before the Court is Tommy Edelin's motion for a complete investigation [7/30/02], the government's response [708], and the motions to join of Marwin Mosley [710], Earl Edelin [712], Shelton Marbury [713], and Henry Johnson [8/1/03], and Johnson's memorandum in support [715]. The final pending motion is Henry Johnson's motion for an evidentiary hearing [709], and the government's response [714]. Upon consideration of the law, the facts, the parties' submissions, and the evidentiary hearings conducted by the Court, the motions for relief will be denied.

## I. Background

This post-verdict motion comes after a lengthy criminal trial in which the defendants were convicted on various narcotics and homicide offenses, and in which the jury declined to impose the death penalty. Tommy Edelin's counsel filed a motion after being approached at the dry cleaner by an alternate juror, Alternate Juror 2,[1] who had been released before deliberations began. Local Criminal Rule 24.2 prohibits a party or attorney from speaking with a juror after a verdict has been rendered "except when permitted by the court for good cause shown in writing." L.Cr.R. 24.2. Furthermore, Federal Rule of Evidence 606(b) provides for a very limited inquiry into outside influences on a jury, but not through an ex parte communication with an attorney. Despite these proscriptions, counsel spoke with the Alternate Juror 2 long enough to gather several allegations of jury bias from her, and included the substance of these allegations in a motion to the Court.[2] Alternate Juror 2 allegedly made three allegations that defense counsel for Tommy Edelin urges show improper jury bias: that Juror 7 had an inappropriate relationship with the Deputy Marshal in charge of the case, that Juror 7 revealed the tally of votes and the jury's split to the Deputy Marshal, and that the jurors improperly deliberated before being instructed.[3]

A few weeks later, one of the attorneys for Bryan Bostick ran into Alternate Juror

1. The jury in this case was empaneled anonymously upon a determination that the defendants posed a danger to their safety. To continue that anonymity, the Court will refer to the three jurors questioned as Alternate Juror 2, Juror 7, and Juror 2269.

2. The motion as originally filed included the name and physical description of the alternate juror, in contravention of the Court's order that the jurors empaneled in this case be anonymous for their own safety. Order of March 5, 2001[441]. The Court ordered that the original motion be sealed, and that counsel refile the motion without any identifying information. Order of October 30, 2002[657].

3. The Court was curious that Alternate Juror 2 never brought to the Court's attention any of these allegations. Alternate Juror 2 confirmed in her testimony that she received a letter, from the undersigned judge, dated November 8, 2001, with the following text:

You recently served as a juror in my court in the case of United States of America v. Tommy Edelin, et al., a trial over which I presided. This was the longest and most difficult criminal case that I have ever handled. Jury selection began on March 26, and opening statements began on May 7. The trial finally concluded with a final verdict on October 24.

2 at a community meeting. Bostick filed a supplement to Edelin's motion stating that Alternate Juror 2 had discussed the jury's conduct with him despite his request that she not do so.[4] The supplement alleges that Alternate Juror 2 stated that the jury panel discussed the case before deliberations, that the deliberating jurors communicated with the discharged alternate juror during deliberations, that the Deputy Marshal told Alternate Juror 2 that Bryan Bostick had confessed to a crime, that the jury panel suspected and discussed among themselves that Juror 7 had an inappropriate relationship with the Deputy Marshal, and that Juror 7 would remain in the van that returned the jury to its secure location at the end of the day with the Deputy Marshal.

To determine whether any of these alleged improprieties occurred and whether they affected the jury's impartiality, the Court held two evidentiary hearings. The first hearing was held June 27, 2003. At that hearing, the Court took the testimony of Alternate Juror 2 and Juror 7. Alternate Juror 2 testified that Edelin's counsel told her that some people, she believed it was the Marshals, were making negative statements regarding her character, which were that she was a violent person who did not get along with the other jurors. Tr. at 7–8. She recounted that she expressed frustration to counsel that the jury had deliberated with only 11 jurors, and that she should have been called back to deliberate,[5] and wondered if this had something to do with the fact that her "character was discredited." Tr. at 9. She stated that she had told Edelin's counsel that she believed that the Deputy Marshal had an inappropriate relationship with Juror 7. Tr. at 10. She said that Juror 7 and several other jurors had been taken to the bank by the

---

I would like to express my formal appreciation to you, individually, for your service to our court in this case. You have contributed to the fair and impartial administration of justice in our community by your performance of duty on this jury. I know that jury duty imposes at least some sacrifice for each person whose routine schedule is disrupted. In this case, you literally had to put your normal life on hold for months. It was really more than any good citizen should be expected to do, and our court and our community were indeed fortunate to have your services.

I especially appreciate your patience as I tried to keep to a minimum the unavoidable delays that occur in any trial, particularly one as complicated as this one, with so many participants.

Without good citizens like you, we could not fairly administer justice. Thank you very much for your dedicated and conscientious service on this jury

Sincerely,

Royce C. Lamberth

It is passing strange that this juror did not make her concerns known to the Court, orally or in writing, but, instead, engaged in a conversation with defendants' counsel.

4. At the June 27 hearing the Court discussed this chance meeting with Alternate Juror 2, and explored whether Bostick's counsel had tried to avoid running afoul of Local Criminal Rule 24.2:

> **The Court:** Okay. In the conversation you had with [Bostick's counsel] at the community meeting, you approached him and said you recognized him?
> **The Alternate Juror:** Um-hmm.
> **The Court:** And then did he make some comment to you about he couldn't talk to you or anything like that?
> **The Alternate Juror:** Not that I remember.
> June 27, 2003 Tr. at 31.

5. The jury reached a verdict in the guilt/innocence phase of this trial as a jury of 12. Following the guilt/innocence verdict, the parties presented additional evidence and testimony in the penalty phase of this death penalty case. During the penalty phase one of the jurors fell ill, and the penalty phase jury deliberated with 11 members. Tr. of Oct. 23, 2001 at 664–65. Because the alternate jurors had not heard the penalty phase evidence, an alternate juror was not called to replace the dismissed member of the panel.

Deputy Marshal, Tr. at 31, and that she had witnessed Juror 7 remaining in the van with the Deputy Marshal on two occasions and had heard rumors from other jurors "that they saw other things." Tr. at 35.

Alternate Juror 2 testified that after she was discharged, the Deputy Marshal asked her by telephone how she felt about the case, and that when she stated she did not believe the government had proven its case against Bryan Bostick, the Marshal said, "Do you know that he admitted he did that?" Tr. at 11, 15. Alternate Juror 2 testified that she responded, "Well as far as the instructions are concerned, I was told that I must see where they had proven that he was guilty beyond a believable [sic] doubt and I didn't see that." Tr. at 11. She said that she had a conversation with Juror 2269, a deliberating juror, while the jury was deliberating, and that Juror 2269 discussed the difference between the charges with her. Tr. at 12–13. She later stated that believed she had told Juror 2269 about the Deputy Marshal's comment regarding Bostick's alleged confession during this telephone call while the jurors were deliberating. Tr. at 30.

Alternate Juror 2 recounted that during the trial she believed that Bryan Bostick was looking at her, and that the other jurors expressed a belief that Bostick might have a romantic interest in her. Tr. at 13–14. She relayed an exchange between herself and the Deputy Marshal, that when the Marshal saw her ML 300 Mercedes he joked that she might need to be investigated. Tr. at 24. She also spoke of another exchange in which the Marshal assigned her and another juror seats in the van that transported the jury from their secret location to the courthouse; the incident happened when the two jurors squab-bled over seats, and she noted that no other jurors had assigned seats. Tr. at 25. She commented that the jurors engaged in some form of discussion regarding the evidence before being charged, and that she did not believe the government had proven its case beyond a reasonable doubt. Tr. at 26–27. The only other type of discussion or outside evidence Alternate Juror 2 could recall was that one of the other jurors said that some of Tommy Edelin's relatives attended the school where that juror taught and the juror felt uncomfortable. Tr. at 30. She explained that she had attended the reading of the jury's verdict on the guilt/innocence phase. Tr. at 27–28. Finally, Alternate Juror 2 explained that she had seen one of the other jurors after the trial ended, and one of the prosecutors, but had not discussed the case with either one. Tr. at 33.

The next witness called at the June 27 hearing was Juror 7, the juror Alternate Juror 2 suspected had an inappropriate relationship with the Deputy Marshal. Juror 7 credibly testified that her relationship with the Deputy Marshal was professional, and that she had never had any social interaction with him outside the courthouse and jury context. Tr. at 41–43. She further recounted that she had never discussed the case, including the defendants' guilt or innocence, with the Deputy Marshal. Tr. at 42, 49. She stated that she had never gone anywhere in the jury van alone with the Deputy Marshal. Tr. at 43. She also testified that she never spent any time in the van alone with the Deputy Marshal, aside from a brief goodbye if she was the last juror to exit the van. Tr. at 47. She described the only outing she had attended with the Deputy Marshal, which involved going with two or three other jurors to pick up a pizza for the jury lunch while the trial was ongoing

and before deliberations.[6] Tr. at 44, 46–47. She said that neither she nor any other juror, to her knowledge, had discussed the vote tallies with the Deputy Marshal. Tr. at 48.

The July 11 hearing was held to examine Juror 2269, the juror that Alternate Juror 2 testified she had spoken with while the jury was deliberating. Juror 2269 testified that she had spoken with Alternate Juror 2 in the courtroom the day after the verdict was read. Tr. at 6. Juror 2269 could not recall whether Alternate Juror 2 discussed her views of the case. Tr. at 7–8. She recounted that Alternate Juror 2 was upset about not being included in the deliberations. Tr. at 8. She testified that Alternate Juror 2 had not said anything about an alleged confession by Bryan Bostick. Tr. at 8–9. She credibly testified that while she may have had one or more phone conversations with Alternate Juror 2, these conversations did not occur during deliberations and she did not disclose any vote tallies to Alternate Juror 2. Tr. at 14–15. The Court questioned Juror 2269 regarding Juror 7 and the Deputy Marshal. Juror 2269 responded that she never witnessed any irregularity or unusual relationship between them. Tr. at 15–16, 19, 21. S

## II. Analysis

■ Federal Rule of Evidence 606(b) limits a juror from testifying on any matter related to deliberations and the verdict except as to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed.R.Evid. 606(b). That is, nobody may inquire into so-called "inside" influences on the jury-such as pressure among jurors, misunderstanding of instructions, a compromise verdict, or a

self-imposed time limit-but only into outside influences. *United States v. Logan,* 250 F.3d 350, 381 (6th Cir.2001). A district court has great discretion in shaping the appropriate inquiry into an allegation of jury prejudice. *United States v. Williams–Davis,* 90 F.3d 490, 496–97 (D.C.Cir.1996); *United States v. Williams,* 822 F.2d 1174, 1190 (D.C.Cir.1987). Generally, the remedy is to hold a hearing to inquire into the alleged prejudicial contact. *Williams–Davis,* 90 F.3d at 496; *but cf. United States v. Boney,* 977 F.2d 624, 634 (D.C.Cir.1992) ("We do not now hold that any false statement or deliberate concealment by a juror necessitates an evidentiary hearing.").

■ The hearing "need not be conducted as a full evidentiary hearing," the inquiry "need only be sufficiently detailed to permit the judge to determine whether any prejudice is likely to result." *United States v. Butler,* 822 F.2d 1191, 1196 (D.C.Cir.1987). The prevention of "juror harassment" through extensive questioning and cross-examination is a legitimate reason to curtail a hearing or not to call jurors in for questioning. *Id.* at 499; *see also Williams,* 822 F.2d at 1189 (declining to adopt a per se rule requiring individual questioning of jurors for a prejudice determination). Discretion in the trial judge is the hallmark in conducting post-verdict examinations of jurors. *See, e.g., United States v. Logan,* 250 F.3d 350, 378 (6th Cir.2001) ("[T]rial judges are afforded considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct.").

*Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), imposes a hearing requirement "whenever an encroachment upon the impartiality of the

---

**6.** The Court supplied the jurors with lunch each day.

jury is threatened." *United States v. Williams*, 822 F.2d 1174, 1188 (D.C.Cir. 1987) (citing *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). The D.C. Circuit has interpreted this to require (1) notice to the accused of juror contact, and (2) an opportunity for the accused to participate in any proceeding to determine its impact. *Williams*, 822 F.2d at 1190. The trial court determines the level of participation that is appropriate by the accused. These requirements were fulfilled in this case. The defendants received notice of the juror contact through the motions of Tommy Edelin and Bryan Bostick. At the hearings, the Court conducted the questioning, with frequent interruptions to allow counsel to propose questions to be asked of the jurors. Each counsel was given the opportunity to suggest questions, and the only questions rejected were those that improperly inquired into the internal functioning of the jury. *See* Fed. R. Evid 606(b).

■ Several courts have endorsed the view that an examination of jurors need not rise to the level of a full adversarial hearing. *See, e.g., United States v. Butler*, 822 F.2d 1191, 1195 (D.C.Cir.1987); *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir.1987) ("The court wisely refrained from allowing the inquiry to become an adversarial evidentiary hearing, so as to minimize intrusion on the jury's deliberations."). The D.C. Circuit has "clearly" stated that "the trial court has broad discretion over the 'methodology' of inquiries into third-party contacts with jurors," a latitude the court explicitly extends to "trial courts' choices as to the proper procedures for post-trial hearings." *Williams–Davis*, 90 F.3d at 498–99 (citation omitted). The risk of "massive examination and cross-examination" rising to the level of juror harassment is a permissible factor to consider in shaping the procedure for a

hearing on juror issues. *Id.* at 499. All the court is required to do is "conduct[ ] an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice on an assumption as to the facts favorable to defendant's claim." *Id.* The more "speculative or unsubstantiated" the allegation of misconduct, the less the burden to investigate. *United States v. Bertoli*, 40 F.3d 1384, 1395 (3d Cir.1994) (quoting *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir.1985)).

The D.C. Circuit upheld a district court's decision to itself question jurors on whether they were aware of a statement made by defendant to a juror in an elevator, and to refuse to ask more detailed questions suggested by counsel. *United States v. Butler*, 822 F.2d 1191, 1195, 1197 (D.C.Cir.1987). The Second Circuit upheld a case in which the district judge conducted an inquiry by taking unsworn testimony *in camera* from jurors with an opportunity for defense counsel to submit questions beforehand. *Calbas*, 821 F.2d at 894; *cf. also Bertoli*, 40 F.3d at 1397 (no Fifth Amendment violation where Court examined jurors in camera for second round of examination). Here, the Court conducted the questioning in the defendants' presence and permitted them to suggest questions to be asked of the jurors.

■ A Court need not examine all jurors, only those relevant to the accusation. *Leisher v. Conrad*, 41 F.3d 753, 756 (D.C.Cir.1994) ("[T]here is no *per se* rule that individual questioning is always required."); *United States v. Williams*, 822 F.2d 1174, 1189 (D.C.Cir.1987) ("We are unwilling to adopt a per se rule that individual questioning is always required."); *United States v. Bertoli*, 40 F.3d 1384, 1395 (3d Cir.1994) (no need for further investigation where court interviewed all jurors involved in alleged misconduct).

Further, a Court has discretion to assess the credibility of jurors' testimony. *Bertoli*, 40 F.3d at 1395 ("[W]e cannot say that the court's decision to believe Juror Six over Juror Thirteen was clearly erroneous. The trial court had to believe one of the two jurors."); *see also Smith v. Phillips*, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (juror testimony is not "inherently suspect").

■ Once there has been a hearing, "[t]he judge then determines whether the exposure was prejudicial or harmless." *United States v. Butler*, 822 F.2d 1191, 1196 (D.C.Cir.1987). In *United States v. Williams–Davis*, 90 F.3d 490 (D.C.Cir. 1996), the D.C. Circuit accepted the District Court's finding of no prejudice where the forewoman's husband allegedly told the jury to "nail" the defendant. The weight of the evidence against the defendants is relevant to the prejudice inquiry. *Williams–Davis*, 90 F.3d at 497. In *Williams–Davis*, the D.C. Circuit found no abuse of discretion by the trial judge in finding no prejudice in part because "the evidence against defendants was overwhelming." *Id.* This case comprised eight months of evidence and testimony, and resulted in multiple convictions. The evidence in this case can certainly be described as "overwhelming."

Not every contact is prejudicial, or "calls for the same investigative technique." *Williams*, 822 F.2d at 1190. Ultimately, "Where the court conducts an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice, on an assumption as to the facts favorable to defendants' claim, it has fulfilled its procedural as well as its substantive duty." *Williams–Davis*, 90 F.3d at 499.

■ *Remmer* placed the burden on the government to overcome the presumption that a contact was prejudicial. *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450 (presumption of prejudice when there is private communication with a juror). However, this standard was modified by the Supreme Court's subsequent decisions in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) and *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). *Smith v. Phillips* states that the remedy for allegations of juror partiality "is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. at 216, 102 S.Ct. 940; *see also Williams–Davis*, 90 F.3d at 496. The D.C. Circuit had interpreted *Remmer* and its successors as vesting "broad discretion in the trial court to assess the effect of alleged intrusions." *Williams–Davis*, 90 F.3d at 496–97. Only if there is a sufficient "likelihood of prejudice" from a particular intrusion will the government have the burden of proving harmlessness. *Id.* at 497. If the court finds that any particular intrusion poses enough of a "likelihood of prejudice," the burden shifts to the government to prove harmlessness. *Williams–Davis*, 90 F.3d at 497.

■ Due process, of course, "does not require a new trial every time a juror has been placed in a potentially compromising situation," *Smith*, 455 U.S. at 217, 102 S.Ct. 940, but only where actual bias has been proven and found to be prejudicial. In assessing juror bias the Court is to consider a number of factors, including: "the nature of the communication, the length of the contact, . . . and the impact of the communication on both the juror involved and the rest of the jury." *United States v. Williams*, 822 F.2d 1174, 1188–89 (D.C.Cir.1987). The decision whether the jury was improperly influenced and biased by an outside communication depends "upon how the jury interprets and expect-

ably will react to the communication made." *Id.* at 1189.

### A. Allegations Made by Alternate Juror 2

Alternate Juror 2 described three different circumstances that could give rise to a possibility of juror bias: an inappropriate relationship between Juror 7 and the Deputy Marshal, the Deputy Marshal's alleged statement that Bryan Bostick had confessed to a murder and Alternate Juror 2's decision to tell this to Juror 2269 about this statement during deliberations, and jury deliberations before being charged. Alternate Juror 2 did not confirm the allegations she had allegedly made to counsel for Tommy Edelin and Bryan Bostick and presented by counsel to the Court that Juror 7 or any other juror disclosed vote tallies to the Deputy Marshal, nor did the other jurors testify that this occurred. Nevertheless, the Court will address this allegation.

#### 1. Inappropriate Relationship

■ Alternate Juror 2 described the circumstances and rumors that led her to believe in the existence of an "inappropriate relationship" between Juror 7 and the Deputy Marshal: that she recalled the Deputy Marshal taking Juror 7 and several others to the bank on one occasion, June 27 Tr. at 31; that she witnessed Juror 7 speaking with the Deputy Marshal in the van on two occasions ("I have seen them twice where we all left and they were still communicating with each other, talking at the bus and on the bus, you know, stepping up to her or whatever," *id.* at 35); that she had heard "hearsay I was told by some other jurors that they saw other things," *id.;* and that she had observed that Juror 7 "would get upset when other Marshals, female Marshals, got near him," *id.* at 10.

As an initial matter, Alternate Juror 2's statements must be considered in the context in which she made them. She described her conversation with Tommy Edelin's counsel as opening with her complaint that she was not called to deliberate. She recalled saying to him: "I didn't understand why they didn't call me if they had 11 jurors. They are supposed to have 12." June 27 Tr. at 7. Counsel's response, she reported, was to mention to her "some statements that were made in reference to my character," which were "that I was a violent person, that I didn't get along with any of the jurors. I was always a problem when I was in the jury room." *Id.* at 7–8. When inquired as to who counsel said made these statements, Alternate Juror 2 responded, "My understanding if I remember it was Marshals who stated it." *Id.* at 8. The tone of the conversation between herself and Edelin's counsel, then, was set by an allegation by Edelin's counsel that the Marshals had defamed her character.

Alternate Juror 2 was upset by this alleged statement, and mentioned it repeatedly throughout her testimony. June 27 Tr. at 8, 9–10, 16, 33. This created an atmosphere in which Alternate Juror 2 felt hostility toward the Marshals, with whom she had not had a good relationship to begin with, *see infra,* and gave her an incentive to discredit them. Furthermore, she was upset that she had not been called back to deliberate, June 27 Tr. at 16–17, a fact corroborated by Juror 2269, July 11 Tr. at 8, and believed it had something to do with the alleged character defamation—giving her further incentive to seek to undermine the jury's verdict. Finally, the Court notes that Alternate Juror 2 has been untruthful in the past, when she failed to disclose a criminal arrest on her initial jury voir dire questionnaire, May 7, 2001 Tr. at 3809–3818, and in her voir dire. April 30, 2001 Tr. at 3395–3397 (discussing

the incident but not revealing that she had been arrested in connection with it).

Alternate Juror 2 did not allege that she observed any inappropriate contact or behavior between the Deputy Marshal and Juror 7; her allegations were based on rumor, inference, and suspicion. She herself acknowledged that she had "no real proof." June 27 Tr. at 10. Furthermore, both Juror 7 and Juror 2269 testified to the contrary. Juror 7 stated that she had a purely professional relationship with the Deputy Marshal and that she never had any social interaction with him other than as a member of the jury. June 27 Tr. at 42. She said that the outing with herself and several other jurors during a lunch recess had not been to the bank, but to pick up a pizza. Tr. at 43. Alternate Juror 2 had not alleged that the outing had been taken by Juror 7 and the Deputy Marshal alone, and Juror 7 recalled that there were probably three and at the least two other jurors present. Tr. at 46. This gives no rise even to an inference of an inappropriate relationship.

As to the van, the laws of physics dictate that the jurors had to alight from the bus one at a time, and that the last person to leave the bus would be on it alone with the Deputy Marshal for the few seconds it takes to say goodbye. This is how Juror 7 described the situation, Tr. at 47, and Alternate Juror 2's account, even if credible, does not contradict it.

Juror 2269 repeatedly stated that she had observed no irregularity or improper behavior between anyone on the jury and any court staff, including the Marshals. July 11 Tr. at 15–16, 19, 21. She said, "A question was never raised to me [that anyone was acting improperly]. I thought the Marshals at all times were rather nice to us, and all of us, and we had conversations that had nothing to do with the court, but just very pleasant people. So I wouldn't say any of it was inappropriate. I never saw anything happen inappropriately, so I'd have to say no." Tr. at 19. When questioned specifically in reference to Juror 7, identified by her jury nickname, she maintained that she had never seen anything irregular between Juror 7 and any court staff or Marshal. Tr. at 21.

The Court finds that there is no evidence that Juror 7 was involved in an inappropriate relationship with the Deputy Marshal, and that Alternate Juror 2's suspicions were unfounded. Alternate Juror 2 presented no evidence whatsoever that such an inappropriate relationship existed, but based her speculation on rumors and suspicions. Juror 7 testified unequivocally that she did not have a social relationship, much less an inappropriate one, with the Deputy Marshal. And Juror 2269 testified that she had not observed anything irregular between Juror 7 and the Deputy Marshal. Furthermore, the burden is on the defendant to prove actual bias. *United States v. Williams–Davis*, 90 F.3d 490, 496 (D.C.Cir.1996). Here, there is no indication of bias, much less of prejudice.

### 2. Deputy Marshal's Alleged Statement Regarding Confession

 The most serious accusation made by Alternate Juror 2 is her allegation that the Deputy Marshal told her that Bryan Bostick had confessed to one murder. The Court does not find Alternate Juror 2 credible on this point. Alternate Juror 2 herself acknowledged that "the Marshals didn't say a lot to us." June 27, 2003 Tr. at 14. This sentiment was reflected in Juror 7's testimony, when she stated that the jurors and the Deputy Marshal "never discussed this trial ever," June 27 Tr. at 42, and that she never had any discussions with the Deputy Marshal regarding the guilt or innocence of the defendants or the evidence in the case, *id.* at 49. Alternate

Juror 2 also indicated in her testimony that she did not have a good relationship with the Deputy Marshal, in recounting the incident in the van with the seating, in which she felt she was unfairly given an assigned seat, June 27 Tr. at 24–25, and that she did not respond in a joking manner to the Deputy Marshal's joke that she might need to be investigated because she drove a nice car, Tr. at 24. She testified that "at times [the Deputy Marshal] made me feel uncomfortable." Tr. at 24. These circumstances make it unlikely that the Deputy Marshal would discuss the case in such an open and conversational manner with Alternate Juror 2 at any time.

Even if this incident occurred, it occurred after Alternate Juror 2 had been released, and therefore could not have created any actual bias in Alternate Juror 2 or caused any prejudice to the defendants. Moreover, the Deputy Marshal's alleged statement did not influence Alternate Juror 2. She stated that "in my opinion it wasn't proven that he committed the crime," and that despite the confession "I was told that I must see where they had proven that he was guilty beyond a believable [sic] doubt and I didn't see that." June 27 Tr. at 11; see also id. at 27 ("Being honest, I probably would have said [the defendants were] not guilty because I didn't see the proof."); id. at 29 ("I made statements [to the Deputy Marshal] be-cause basically I guess my comment was that even if he admitted it, I didn't see proof and so I still couldn't say, yes, you are guilty."). That Alternate Juror 2 either disbelieved or discredited the Deputy Marshal's alleged statement makes the possibility that she passed it on to a deliberating juror even more remote.

Alternate Juror 2 was unsure that she had relayed this comment to Juror 2269, and that if she had it was during deliberations. June 27 Tr. at 30 ("I think I did say to that to [Juror 2269]. I think I mentioned that to her . . . . If I am correct it was during the time while they were deliberating I think."). Alternate Juror 2 stated that in her alleged telephone call with Juror 2269 during deliberations, she refrained from giving an opinion on the verdict in telling her "I don't know [how I would vote] because I don't even know what the questions are." June 27 Tr. at 13. If she refused to comment on the evidence in the case, it is even less likely that she would comment on an alleged extra-judicial comment on non-evidence.

Juror 2269 stated that she had not spoken with Alternate Juror 2 by telephone while the jury was deliberating, saying "I did not talk to her at all, as far as I remember, during deliberation." July 11 Tr. at 15. Her testimony consistently revealed the truth of this statement.[7] She

---

7. Juror 2269's testimony at one point can be interpreted to say that she spoke with Alternate Juror 2 during deliberations:

> The Court: So did you talk to her during the course of the trial also?
> Juror Number 2269: I don't remember talking to her on the phone, but I may have, but we did talk during lunch.
> The Court: Okay. Do you have any notion if she thought that during the time the jury was deliberating you had two or three phone conversations, do you have any—
> Juror Number 2269: That may be true. That may be true but it was in a personal nature as far as I remember.

> The Court: It didn't deal with the jury matters of the deliberations?
> Juror 2269: No. No.
> The Court: Okay. You didn't—
> Juror Number 2269: I did not talk to her at all, as far as I remember, during deliberation.

July 11 Tr. at 15. While Juror 2269 said at one point that it "may be true" that she had conversations with Alternate Juror 2 during deliberations, the transcript and her demeanor at the hearing show that she had misunderstood the question to ask had she ever had two or three telephone conversations with Alter-

stated that she had not discussed the deliberations with Alternate Juror 2 because "I didn't talk to her during deliberations." *Id.* When questioned whether she had discussed the jury's vote tally with Alternate Juror 2, Juror 2269 responded, "I suppose not, because I didn't talk to her during deliberation." *Id.* Juror 2269 testified emphatically that Alternate Juror 2 had not made any statement to her regarding Bostick's alleged confession, responding to the question with "Absolutely not," and "She never said that to me." July 11 Tr. at 9. The Court finds that Juror 2269 is the more credible witness on this point.

Alternate Juror 2 testified that she initiated the call to Juror 2269. Tr. at 26. Alternate Juror 2 stated "[Juror 2269] said she was going to call me and just talk to me as a friend. She never did." June 27 Tr. at 13. Juror 2269 stated that she had not spoken to Alternate Juror 2 since shortly after the trial. July 11 Tr. at 7. She had difficulty recalling when and where she spoke to Alternate Juror 2. July 11 Tr. at 6–7 (spoke to her in courtroom either the day the verdict was announced or the day after). She did not remember Alternate Juror 2's views on the case. Tr. at 7–8 ("I don't remember what those views were, to be honest with you. It's almost a year and a-half ago, and I really don't."). These discrepancies between the jurors' testimony show that Alternate Juror 2 perceived a level of friendship between the two jurors that Juror 2269 did not share. Juror 2269 could not remember speaking with Alternate Juror 2 outside the trial until reminded of it, and could not recall how often they had spoken. She did not remember Alternate Ju-

ror 2's views on the case. Alternate Juror 2 expressed some disappointment that the women had not become friendly enough for Juror 2269 to call her. Given this situation, Alternate Juror 2's testimony that they discussed the case in detail during deliberations is not credible, especially given her acknowledged inability to remember clearly whether she had spoken to Juror 2269 during deliberations and, if she had, whether she had told Juror 2269 about Bostick's alleged confession.

The Court further finds that the circumstances surrounding this particular allegation make it even less likely to be credible that the other allegations. During the trial, a bench conference was held in which the Court stated that "Alternate Number 2, who is one of those that had made that comment about Mr. Bostick staring at him [sic], said to the Marshal, 'What do you do if one of the defendants looks like he's fallen in love with you?' . . . I did observe the defendants today and did not see any kind of nonverbal communication that was apparent to me. I did observe Mr. Bostick throughout the course of the day and never really saw any nonverbal communication between he and any juror. I did see this afternoon he had a number of conversations with both of his counsel and wrote notes back and forth and looked at the witness, and I really never observed him even looking at the jurors." July 30, 2001 Tr. at 15,811. Mr. Bostick's counsel responded "This is very ironic, Your Honor, because Mr. Bostick expressed concerns to me . . . and [co-counsel] that she was staring at him . . . and I actually noticed and I kept saying to her [sic] just don't look at

---

nate Juror 2. Upon realizing her mistake, she quickly corrected her testimony-without a question from the Court-to state that she did not speak to Alternate Juror 2 during deliberations. This was an understandable, brief, and quickly corrected misstatement arising

from confusion. Juror 2269 was called to the courthouse and was given no explanation as to why she needed to appear, and then was called to testify to a full courtroom. It is only to be expected that she would be nervous and might misspeak.

her.... I mean I noticed and [co-counsel] can confirm that. He's shaking his head yes. But, yeah, we did notice that she was, you know, seemingly staring at him because he said, gee, does she know me or whatever." *Id.* at 15,812. In the June 27 hearing, Alternate Juror 2 acknowledged that during the trial she believed that Bryan Bostick was staring at her, which she said lead the other jurors to joke that he had fallen in love with her. June 27 Tr. at 14. That Alternate Juror 2 believed that there was a connection between Bostick and herself gave her an especial incentive to undermine the verdict against him.

The only relevant inquiry where a postverdict allegation of extraneous information is proffered is "the precise nature of the information proffered and the degree, if any, to which that information was actually discussed or considered." *United States v. Calbas*, 821 F.2d 887, 896–97 (2d Cir.1987). There are several factors to consider in assessing juror bias: the nature of the communication, the length of the contact, the possibility of removing juror taint by limiting instruction (inapplicable here), and the impact of communication on the involved juror and the rest of the jury. *United States v. Williams*, 822 F.2d 1174, 1188–89 (D.C.Cir.1987). Here, there is no evidence that the information was discussed or considered by the jury, and hence no evidence of any impact the alleged communication had on the jury. Juror 2269 did not receive the information, and therefore could not have given it to the deliberating jurors. Alternate Juror 2 was not a deliberating juror, and therefore could not have "actually discussed or considered" the alleged confession during deliberation. The Court finds that Alternate Juror 2's allegation that the Deputy Marshal told her that Bryan Bostick had confessed to a murder is unsupported and not credible. Furthermore, even if this statement had been made, it was not relayed to

a deliberating juror, much less to the entire deliberating jury.

### 3. Pre–Deliberation Discussions

■ While the D.C. Circuit has not condoned pre-deliberation discussions, it has taken a practical approach rooted in reality to acknowledge that jurors are likely to discuss the case before being charged, and that "[t]he probability of some adverse effect on the verdict is far less than for extraneous influences" and " 'there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.' " *Williams–Davis*, 90 F.3d at 505 (quoting *United States v. Resko*, 3 F.3d 684, 690 (3d Cir.1993)). The court ruled that "a trial court is virtually automatically justified in declining to pursue such an inquiry." *Id.* at 504. This is partly because the probability of an adverse effect on a verdict is lower than for outside influences. *Id.* at 505; *see also United States v. Bertoli*, 40 F.3d 1384, 1394 (3d Cir.1994) ("[I]ntra-jury communications pose a less serious threat to defendant's right to an impartial trial than do extra-jury influences, and therefore district courts are entitled to even greater deference in their responses to them than in responses to outside influences.").

Here, the allegation of premature deliberation must be inferred from Alternate Juror 2's testimony:

> **The Court:** Okay. Did you say anything to her [Juror 2269] about how you thought the jury should vote or what you thought about the evidence or anything like that?

> **The Alternate Juror:** That was said-everybody, not everybody most of the jurors made comments about that. That was like, no, we are not supposed to talk about it, but we did and most of the

jurors made comments in reference to that.

So I am not-I don't know if I said that on the phone in conversations or I may have said it when we were in the jury room because it appeared that everybody had their different views; but I can say that as far as me personally, if you are asking me to find beyond a reasonable doubt that the prosecutors find these people guilty and there are certain issues that I think don't constitute that they really did it, this is not proved to me, then I will say whether I believe they did it or not I have to go with the truth. They didn't prove it to me.

June 27 Tr. at 26–27.

Assuming that Alternate Juror 2 meant to say by this statement that the jurors engaged in discussion with one another regarding the evidence before being charged, nothing in this statement, and the defendants point to nothing, indicates that any pre-deliberation that might have occurred was prejudicial. No outside influence is alleged. The trial lasted 8 months, and the D.C. Circuit has recognized the possibility that jurors, "whose salient common interest must be the trial unfolding before them for several hours a day," might be unlikely "to obey the strictures of the standard rule." *Williams–Davis*, 90 F.3d at 505. Given the fact that even if these discussions occurred, no allegation of prejudice is offered (nor can the Court discern any manner in which this may have prejudiced defendants). Quite the opposite, in fact, as Alternate Juror 2 clearly had a strong belief that the government had not met its burden of proof and the opinion she expressed during any pre-deliberation, as quoted above, reflected that belief, and any prejudice would be to

the government rather than the defendants. *Cf. United States v. Calbas*, 821 F.2d 887, 896 n. 9 (2d Cir.1987) (district court entitled to rely on the fact that extraneous information was intended to lead to acquittal to find no prejudice to defendant).

### 4. Disclosures to Deputy Marshal

██ Tommy Edelin's counsel reported in his motion that Alternate Juror 2 stated that Juror 7 had disclosed vote tallies and vote splits to the Deputy Marshal. Alternate Juror 2 did not confirm this allegation during her testimony. Juror 7 stated that she did not disclose any vote tallies to the Deputy Marshal. June 27 Tr. at 48. However, to avoid any future disputes, the Court will evaluate this allegation as though Alternate Juror 2 had made it. This conduct is evaluated as a communication outside the trial. There is no allegation that the Deputy Marshal provided any outside information about the case but rather that information was allegedly passed to the outside from the jury. Thus, as in *Butler*, "[t]he nature of the contact was relatively innocuous; it did not provide the juror with any crucial extra-judicial information, and it did not constitute an attempt to bribe or intimidate the juror." *United States v. Butler*, 822 F.2d 1191, 1196 (D.C.Cir.1987). The prejudice analysis depends, inter alia, on the type of contact alleged to have occurred between the jury and an outside source. "[T]he innocuous nature of a contact will have great bearing on the question whether prejudice has already occurred." *United States v. Williams*, 822 F.2d 1174, 1188 & n. 147 (D.C.Cir.1987). Here, giving the defendants all reasonable inferences and presumptions, even if this alleged communication occurred, it was not prejudicial. Moreover, even if this was occurring, it

was in the nature of pre-deliberation[8] and, as discussed above, does not require further inquiry.

### B. Contact between Deputy Marshal and Juror 2269

 At the July 11 hearing, Juror 2269 stated that she had spoken with the law clerk and with the Deputy Marshal to arrange her pick-up to attend the hearing. She described the entire content of her conversation with the Deputy Marshal as limited to "where I was going to be picked up, what time, and with whom." July 11 Tr. at 14. She further stated that she did not know why she had been called to the Court, *id.,* confirming that she had not spoken with the Deputy Marshal on any substantive matter but only on the logistical aspects of her pick-up.

The defendants argue that this contact between Juror 2269 and the Deputy Marshal was improper and prejudicial. This argument fails. The jury in this trial was anonymous, based on a determination that the defendants posed a danger to the jurors. This Court has preserved that jury anonymity throughout the proceedings. Preservation of juror anonymity and protection of the jurors required following the same procedures for these hearings as were followed in the trial: the jurors met the Marshals at a designated but undisclosed Metro stop, and were brought to the courthouse in a van. This procedure was employed every day the jury sat in this lengthy eight month trial. Having coordinated this procedure for the entire trial, the Deputy Marshal was the person most familiar with and the best able to arrange for Juror 2269's pick-up. The routine use of this procedure and tele-phone confirmation of it by the Deputy Marshal was not improper.

There is *no* need to inquire further into the contact because the Court thoroughly explored it at the July 11 hearing, and the juror stated and confirmed that the contact was limited to the pick-up arrangement. The Deputy Marshal did not operate the van that brought Juror 2269 to the courthouse or have any direct contact with her. Furthermore, Juror 2269 swore to tell the truth in this matter. July 11 Tr. at 5. There is no indication whatsoever that she broke that oath. Her testimony was internally consistent and credible and her demeanor was thoughtful, without a sign of nervousness *or other* behavior that would indicate a lack of truthfulness

### C. Henry Johnson's Motion for Hearing

 Henry Johnson's counsel was not present at the June 27 hearing because of a family emergency, and arranged for substitute counsel to represent Mr. Johnson. At the hearing, substitute counsel stated that he was not aware that the hearing was to be an evidentiary hearing, and that he needed to speak with Mr. Johnson regarding whether the defendant wanted to go forward with substitute counsel. At this point, Mr. Johnson interjected, stating, "I object, Your Honor." Mr. Johnson, left without representation based upon his own objection, was then excused from the courtroom. June 27 Tr. at 3–4. Johnson filed a motion seeking to have the Court reconvene the hearing for his counsel to question Alternate Juror 2 and Juror 7.

Rule 43 requires the defendant's presence in three specified stages of a trial: "(1) the initial appearance, the initial arraignment, and the plea; (2) every trial

---

8. Because Alternate Juror 2 was not present during deliberations, her alleged claim to defense counsel could not have been that Juror 7 supplied vote tallies to the Deputy Marshal during deliberations, but would have to apply to pre-deliberation.

stage, including jury impanelment and the return of the verdict; and (3) sentencing." Fed.R.Crim.P. 43(a). The June 27 hearing did not fall into any of those three categories. The trial in this case was completed when the jury delivered its final verdict on October 24, 2001. The defendants have not yet been sentenced. Rule 43 does not mention nor apply to a hearing that is neither an appearance, a trial, nor a sentencing. While a defendant has a right to be present at trial, this has never extended to a right to be present at hearings held before or after trial. *United States v. Lynch*, 132 F.2d 111, 113 (3d Cir.1943); *see also Snyder v. Commonwealth of Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ("The underlying principle gains point and precision from the distinction everywhere drawn between proceedings at the trial and those before and after. Many motions before trial are heard in the defendant's absence, and many motions after trial or in the prosecution of appeals."). Defendant Johnson's presence was not required at the hearing. Johnson effected a waiver of his presence by objecting to representation by substitute counsel. *See Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (holding that a defendant can waive his right to be present at trial); *Campbell v. Blodgett*, 978 F.2d 1502, 1509–10 (9th Cir.1992) (recognizing a variety of circumstances in which a defendant may waive his presence at trial).

Furthermore, had Johnson remained in the hearing after dismissing his substitute counsel, his presence would not have affected the proceedings. *Snyder*, 291 U.S. at 106–07, 54 S.Ct. 330 ("Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow."). It would not have been in Johnson's interest to partici-

pate directly in the proceedings, as it could have resulted in a waiver of his Fifth Amendment right against self incrimination. Furthermore, "[f]or any represented party to communicate with the court directly is unorthodox." *Yardis Corp. v. Perry Silver*, 2000 WL 1763667 (E.D.Pa. Nov.30, 2000).

Johnson's counsel contends, "[a]s a result of Mr. Johnson and his counsel were absence [sic], questions that may be important to Mr. Johnson's defense were not allowed to be asked." Johnson Motion [709] at 5. Counsel did not elaborate on any such question. The government, in its response [709], urged counsel to submit any questions that were not asked that would have been beneficial to Johnson's case. Johnson did not seek to supplement his motion. None of the jurors implicated or even mentioned Johnson in any way. Nor has Johnson's counsel reported any unauthorized contact with any of the jurors that has raised further issues or issues specific to him. It is unknown what questions Johnson could have asked other than those asked by the Court and suggested by the attorneys for the other defendants. All the issues raised by counsel for Tommy Edelin and Bryan Bostick were thoroughly explored. In the absence of any indication from Johnson that any specific questions were left unasked or unanswered, in light of the Court's denial of all motions for relief in connection with Alternate Juror 2's allegations, and given that Rule 43 did not confer on Johnson a right to attend the hearing and that he waived any right he may have had, the Court will not hold a further evidentiary hearing in this matter.

### III. Conclusion

To disturb a jury's verdict, the Court must be satisfied that there is proof both of an improper outside influence causing

bias and that the bias prejudiced the defendant. The Court has great discretion in crafting the inquiry and remedy where there has been an allegation of improper jury conduct. The defendants here claim that a variety of circumstances caused prejudicial bias within the jury: an inappropriate relationship between Juror 7 and the Deputy Marshal, a comment by the Deputy Marshal to released Alternate Juror 2 that Bryan Bostick confessed to a murder, pre-deliberation, and a disclosure of jury vote tallies by Juror 7 to the Deputy Marshal.

After conducting two evidentiary hearings, the Court finds that there was no inappropriate relationship between Juror 7 and the Deputy Marshal; that the Deputy Marshal did not tell Alternate Juror 2, after she was released, that Bryan Bostick had confessed to a murder and that Alternate Juror 2 did not relay such an alleged comment to deliberating Juror 2269 during deliberations; that Alternate Juror 2 did not speak to Juror 2269 during deliberations; and that Juror 7 did not disclose any jury votes to the Deputy Marshal. The Court further finds that the jury did not engage in pre-deliberation, and that if it did " 'there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial.' " *Williams–Davis,* 90 F.3d at 505 (quoting *United States v. Resko,* 3 F.3d 684, 690 (3d Cir.1993)). The Court further finds that the brief telephonic contact between Juror 2269 and the Deputy Marshal to arrange the routine pick-up necessary to preserve her anonymity and limited to the logistics of that pick-up did not prejudice the defendants. Finally, the Court finds that Henry Johnson was not prejudiced by his absence from the June 27 hearing.

A separate Order shall issue this date.

## ORDER

This comes before the Court on Defendant Tommy Edelin's motion for appropriate relief [650], the United States' Response [648], Edelin's reply [667], Bryan Bostick's Supplement [702] and memorandum [707], and Earl Edelin's [666] and Marwin Mosley's [697] motions to join. Also pending before the Court is Tommy Edelin's motion for a complete investigation [7/30/02], the government's response [708], and the motions to join of Marwin Mosley [710], Earl Edelin [712], Shelton Marbury [713], and Henry Johnson [8/1/03], and Johnson's memorandum in support [715]. The final pending motion is Henry Johnson's motion for an evidentiary hearing [709], and the government's response [714]. Upon consideration of the law, the facts, the parties' submissions, and the evidentiary hearings conducted by the Court, and for the reasons set forth in an accompanying memorandum opinion,

It is hereby ORDERED that the Tommy Edelin's motion for appropriate relief [650] is DENIED.

It is further ORDERED that Earl Edelin's motion to join in part Tommy Edelin's motion for appropriate relief [666] is hereby GRANTED.

Earl Edelin's motion to waive his presence and the presence of counsel and to be represented by substitute counsel [703] was GRANTED orally at the June 27, 2003 hearing. It is hereby ORDERED that the Clerk shall terminate this motion from the pending motions docket.

It is further ORDERED that Shelton Marbury's motion to join the motion for appropriate relief [497] is hereby GRANTED.

It is further ORDERED that Marwin Mosley's motion to join the motion for appropriate relief [697] is GRANTED.

It is further ORDERED that the Clerk's office shall docket Bryan Bostick's Motion to Join and Adopt Co–Defendant Tommy Edelin's Motion for Appropriate Relief [10/21/2002]. It is further ORDERED that the motion is hereby GRANTED.

It is further ORDERED that Tommy Edelin's motion for a complete investigation [7/30/02] is DENIED.

It is further ORDERED that Marwin Mosley's motion to join Tommy Edelin's motion for a complete investigation and Henry Johnson's motion for an evidentiary hearing [710] is GRANTED.

It is further ORDERED that Earl Edelin's motion to join Tommy Edelin's motion for a complete investigation [712] is GRANTED.

It is further ORDERED that Shelton Marbury's motion to join Tommy Edelin's motion for a complete investigation [713] is GRANTED.

It is further ORDERED that Henry Johnson's motion to join Tommy Edelin's motion for a complete investigation [8/26/2003] is GRANTED.

It is further ORDERED that Henry Johnson's motion for an evidentiary hearing [709] is DENIED.

SO ORDERED.