# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 5, 2014   Decided June 26, 2015

Nos. 04-3074, 05-3010, 05-3011, 05-3012, 05-3013

UNITED STATES OF AMERICA,
APPELLEE

v.

BRYAN BOSTICK,
TOMMY EDELIN,
EARL EDELIN,
SHELTON MARBURY, AND
HENRY JOHNSON,
APPELLANTS

———

Appeals from the United States District Court
for the District of Columbia
(No. 98cr00264-01)
(No. 98cr00264-06)
(No. 98cr00264-07)
(No. 98cr00264-08)
(No. 98cr00264-16)

———

*Tony Axam, Jr.,* Assistant Federal Public Defender, *Sebastian K.D. Graber*, *Joseph Virgilio*, *Jenifer Wicks*, and *Ernest W. McIntosh, Jr.*, all appointed by the court, argued the causes for appellants. With them on the joint briefs was *A.J. Kramer*, Federal Public Defender.

*Suzanne C. Nyland*, Special Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: KAVANAUGH and WILKINS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: From 1985 to 1998, Tommy Edelin ran a massive drug distribution organization in Southeast Washington, D.C. The organization sold crack cocaine and other drugs, and committed numerous murders and other violent crimes. After an intensive law enforcement investigation of the organization, six defendants were indicted for violations of federal and D.C. law. After a lengthy and complicated trial, five of those defendants – Tommy Edelin, Earl Edelin, Bryan Bostick, Henry Johnson, and Shelton Marbury – were convicted by a jury and sentenced to life imprisonment. They now appeal. (The sixth defendant was also convicted but died after trial.)

On appeal, the defendants contest their convictions by challenging, among other things, the sufficiency of the evidence, the jury instructions, various evidentiary rulings, and alleged juror misconduct. We affirm the judgments of conviction.

The defendants also challenge their sentences. They were sentenced to life imprisonment under the mandatory Sentencing Guidelines that were in effect before the Supreme Court's landmark Sixth Amendment decision in *United States v. Booker*, 543 U.S. 220 (2005). Under *Booker*, the

Guidelines are now advisory. Two of the defendants (Earl Edelin and Henry Johnson) raised Sixth Amendment objections in the District Court. Under *Booker*, they are entitled to vacatur of their sentences and resentencing under the advisory Sentencing Guidelines. Two of the defendants (Bryan Bostick and Shelton Marbury) did not raise the Sixth Amendment issue in the District Court. But on plain error review, they are still entitled to what our cases have termed a *Booker* remand of the record to determine whether the District Court would impose different sentences, more favorable to the defendants, under the advisory Guidelines. *See United States v. Coles*, 403 F.3d 764, 770 (D.C. Cir. 2005). The sentence of the remaining defendant, Tommy Edelin, is affirmed. Based on his conviction for continuing criminal enterprise, which we affirm, Tommy Edelin received a statutorily mandated life sentence, which did not depend on the Sentencing Guidelines. *Booker* does not affect his sentence, as he has expressly conceded on appeal.

In their appeal, the defendants have raised a great number and variety of arguments. Those arguments are not amenable to easy categorization, so we will just address them one after the other.

I

We first provide the factual and procedural background. Because we are reviewing a jury verdict of guilt, we recount the evidence in the light most favorable to the Government.

In 1996, the Federal Bureau of Investigation and the D.C. Metropolitan Police Department started a joint investigation into the activities of Tommy Edelin's drug distribution organization. By that time, Tommy Edelin was leading a large-scale drug ring that distributed massive quantities of

crack cocaine, powder cocaine, and heroin in the Washington, D.C., area.

During the 1980s and 1990s, Tommy Edelin purchased large quantities of drugs from wholesale suppliers in New York. In Washington, D.C., he provided the drugs to a group of mid-level distributors. Those mid-level distributors in turn sold the drugs to street-level dealers, who then sold to retail customers primarily in the Stanton Dwellings and Congress Park neighborhoods of Southeast Washington, D.C. Edelin distributed drugs through a credit arrangement called "fronting," whereby Edelin fronted the drugs to his dealers, who paid him only after making their sales. Edelin used his profits to finance larger drug purchases and expand his distribution network.

In the course of their activities, Tommy Edelin and his associates committed numerous murders and shootings, often during clashes with rival drug crews. Those conflicts frequently followed a pattern: A dealer from a rival group would rob or attack one of Edelin's associates. Edelin would respond by ordering his associates to kill the attacker as well as members of the attacker's crew. Throughout the 1990s, several of Edelin's distributors and dealers, including the defendants here, participated in such violence.

Tommy Edelin's father is Earl Edelin. Earl Edelin served as a top lieutenant in his son's drug distribution network. The elder Edelin worked as a mid-level distributor, supplying his son's drugs to other mid-level and street-level dealers. In the 1990s, Earl Edelin worked at the Stanton Dwellings community recreation center. He gave members of the organization access to the recreation center, where they could cook cocaine powder into crack, sell drugs, and store guns, money, and drugs. He also taught his son's associates how to

shoot to kill, and he provided weapons to them. Finally, Earl Edelin warned others in the organization about planned police raids and suspected confidential informants.

In the early 1990s, Bryan Bostick worked for Tommy Edelin as a mid-level distributor and hitman. Although Tommy Edelin initially declined to supply Bostick with drugs, he changed his mind after witnessing Bostick murder two people at a traffic light. Acting on Tommy Edelin's orders, Bostick also attacked several individuals in the course of a dispute with a rival drug crew.

Like Bostick, Henry Johnson was a mid-level distributor of crack cocaine and a hitman in Tommy Edelin's organization. During the 1990s, he purchased crack cocaine from other mid-level distributors, including Earl Edelin, and resold it to street-level dealers. In addition, Johnson committed at least one murder during a conflict with the Stanton Terrace Crew, a rival drug group, in 1996.

Shelton Marbury was a street-level dealer of crack cocaine. He operated at the lowest level of Tommy Edelin's distribution network. He committed two murders and participated in several shootings during the conflict with the Stanton Terrace Crew in 1996.

In 1996, the Stanton Terrace violence caught the attention of law enforcement and prompted the investigation into Tommy Edelin's organization. Two years later, Tommy Edelin was arrested after purchasing wholesale quantities of cocaine and heroin in a government sting operation.

Six defendants were later indicted in a 90-count indictment that charged offenses under federal law and the D.C. Code. The charges included conspiracy to distribute

narcotics in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A) (Count One), conspiracy to participate in a racketeer-influenced corrupt organization in violation of 18 U.S.C. § 1962(d) (Count Three), and numerous counts of murder, assault with intent to murder while armed, violent crime in aid of racketeering activity, and various firearm offenses. Tommy Edelin was also charged with engaging in a continuing criminal enterprise in violation of 21 U.S.C. §§ 848(a) and (b) (Count Two), unlawful use of a communication facility (Counts 86-88), and possession with intent to distribute one kilogram or more of heroin and five kilograms or more of cocaine (Counts 89-90). The prosecution's case featured extensive testimony from many cooperating witnesses who had been involved in Tommy Edelin's organization. The jury found the defendants guilty on numerous counts. Applying the then-mandatory Sentencing Guidelines, the District Court sentenced the defendants to life imprisonment. One of the defendants, Marwin Mosley, was convicted, but he died in 2006 and his appeal was subsequently dismissed.

II

The defendants raise several sufficiency of the evidence arguments. When considering a challenge to the sufficiency of the evidence, we uphold a guilty verdict where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gaskins*, 690 F.3d 569, 576 (D.C. Cir. 2012) (internal quotation marks omitted). We do not distinguish between direct and circumstantial evidence in making that assessment. *Id.* at 577. The "evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."

*United States v. Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991) (internal quotation marks omitted). Under that deferential standard of review, the evidence in this case easily suffices to sustain the guilty verdicts.

A

Count One of the indictment alleged that the defendants participated in a single drug conspiracy led by Tommy Edelin. All five defendants contend that the evidence at trial showed multiple conspiracies rather than the single drug conspiracy charged in Count One.

Whether the evidence proved a single conspiracy "is primarily a question of fact for the jury." *United States v. Childress*, 58 F.3d 693, 709 (D.C. Cir. 1995) (internal quotation marks omitted). On appellate review, the relevant question is therefore "whether there is sufficient evidence – when viewed in the light most favorable to the government – to support a jury finding of a single conspiracy agreed to" by all of the defendants. *Id.*

The Government's theory at trial was that Tommy Edelin headed a single, chain-model narcotics distribution and racketeering organization, through which he directly supplied some mid-level dealers, such as Earl Edelin and Bryan Bostick, and indirectly supplied other mid- and street-level dealers, such as Henry Johnson and Shelton Marbury, respectively. In addition to distributing drugs, Bostick, Johnson, and Marbury carried out murders and other violent acts in support of the conspiracy.

We consider three factors to determine whether the evidence supports a conclusion that the defendants belonged to a single conspiracy: whether the alleged participants had

(1) a common goal, (2) interdependence, and (3) overlap, "such as the presence of core participants linked to all the defendants." *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996).

This sufficiency of the evidence issue is not close, especially given our deferential standard of review. The Government overwhelmingly established each defendant's membership in the single charged conspiracy. The massive evidence regarding the defendants' significant drug distribution activities plainly demonstrates that they shared the organization's goal of selling drugs. The evidence establishes interdependence among the participants: For example, Marbury depended on mid-level distributors in Tommy Edelin's network, like Earl Edelin and Johnson. Mid-level distributors like Earl Edelin, Johnson, and Bostick in turn relied on other mid-level distributors in the organization or directly on Tommy Edelin. And Tommy Edelin relied on the others to distribute and sell the drugs. And the evidence indicates that there were overlapping core participants – such as Earl Edelin – with ties to defendants on both ends of the supply chain.

We need not spend long on this point. From the overwhelming evidence of the defendants' common goal, interdependence, and overlapping core of participants, a reasonable jury could easily conclude that the defendants were part of a single drug distribution conspiracy.

B

Even if all of the defendants belonged to a single drug conspiracy, they say that "certain actions were outside the chain and formed a separate conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988).

First, the defendants argue that Bostick's murder of two people at a traffic light fell outside the scope of the charged conspiracy. They claim that they were prejudiced by the Government's inflammatory presentation of those allegedly unrelated murders.

Bostick was riding with Tommy Edelin in Edelin's car when Bostick spotted a vehicle that he thought belonged to one of his rivals. With Tommy Edelin's permission, Bostick exited the car at a traffic light and shot the two occupants of the other vehicle, killing both. The victims turned out to be innocent teenage siblings Rodney and Volante Smith, not Bostick's rivals.

The defendants maintain that Bostick committed those murders as part of a feud that was unrelated to Tommy Edelin's organization. But the record indicates that Tommy Edelin authorized the shooting and was pleased with Bostick's demonstrated ability to kill. Witnesses testified that after the murder, Tommy Edelin rewarded Bostick with a car, a direct supply of drugs, and a place in his inner circle. Based on that evidence, a rational jury could find that Bostick committed those murders in part to enhance his status and role within Tommy Edelin's drug organization and that the murders were therefore within the scope of the drug distribution conspiracy. *Cf. United States v. Carson*, 455 F.3d 336, 370 (D.C. Cir. 2006) (jury could find that shooting was in aid of racketeering and drug distribution enterprise where defendant shot rival in part "to maintain or increase his own reputation as an enforcer in the enterprise").

Second, Earl Edelin, Johnson, and Marbury claim that the Stanton Terrace Crew killings were committed in retaliation

for the Crew's assault and robbery of Marbury's relatives, not as part of the conspiracy to distribute drugs for profit.

We reject that argument because the evidence adequately supports the conclusion that the violence was committed in furtherance of the drug distribution conspiracy. When the Stanton Terrace conflict began, Tommy Edelin told co-conspirator Thomas Sims: "Take care of these people quick before it affect the money." July 2, 2001 Trial Tr. at 12071 (Thomas Sims). Tommy Edelin directed Sims to kill Stanton Terrace Crew members. *Id.* Later in the conflict, Tommy Edelin ordered the murder of a Stanton Terrace Crew affiliate who had shot at one of his top lieutenants. Johnson helped carry out that murder.

Earl Edelin taught Sims, Johnson, Marbury, and others how to use firearms to kill Stanton Terrace Crew members. He gave Marbury a gun to use in the shootings. In addition, Earl Edelin communicated with Sims during the dispute and passed along information about where Stanton Terrace Crew members could be found.

That evidence indicates that the Stanton Terrace murders were committed, at least in part, to protect the profits and operations of Tommy Edelin's drug distribution enterprise. The dispute threatened Tommy Edelin's distributors and their drug sales. Killing Stanton Terrace Crew members neutralized that threat and ensured that distribution continued smoothly. Tommy Edelin's direct involvement in the dispute further indicates that the murders were committed in furtherance of the drug conspiracy, even if there also were other motives.

C

Defendants Earl Edelin, Johnson, and Marbury argue that the Government failed to produce sufficient evidence of their specific intent to further Tommy Edelin's drug distribution scheme. "To prove that a defendant entered into a narcotics conspiracy under 21 U.S.C. § 846, the government must prove that he did so knowingly" and with "the specific intent to further the conspiracy's objective." *Gaskins*, 690 F.3d at 577 (internal quotation marks omitted).

The Government introduced abundant evidence about Earl Edelin's central role in the drug conspiracy. He not only sold his son's crack to other dealers but also recruited new mid-level distributors. During disputes with rival drug crews, Earl Edelin provided firearms expertise and weapons to his son's associates. He also warned the group about police raids, suspected cooperators, and enemy dealers. While employed at a community recreation center, Earl Edelin gave out keys to the facility so that the group would have a secure place to store contraband and sell drugs. That evidence easily supports the conclusion that Earl Edelin specifically intended to further the conspiracy's aim of distributing drugs for profit.

Johnson and Marbury argue that there is insufficient evidence showing that they knew that Tommy Edelin supplied their suppliers or were otherwise aware of a larger conspiracy. At most, they contend, the evidence shows that they were engaged in independent buyer-seller relationships. But we have stated that "a jury may properly find a conspiracy, rather than a buy-sell agreement, where the evidence shows that a buyer procured [or a seller sold] drugs with knowledge of the overall existence of the conspiracy." *United States v. Sanders*, 778 F.3d 1042, 1053 (D.C. Cir. 2015) (quoting *United States v. Thomas*, 114 F.3d 228, 241 (D.C. Cir. 1997))

(internal quotation marks omitted). "Among the factors demonstrating such knowledge are the existence of repeated, regular deals; drug quantities consistent with redistribution; and the extension of credit to the buyer." *Id.*

Johnson and Marbury regularly purchased resale quantities of crack cocaine from mid-level members of Tommy Edelin's organization, and they then redistributed those drugs. Johnson also regularly supplied street-level dealers in Tommy Edelin's organization. Credit arrangements were a common feature of their transactions. A reasonable jury could therefore conclude that Johnson and Marbury entered the conspiracy with the specific intent to further its objective.

To be sure, we have cautioned that "[c]hain analysis must be used with care." *Tarantino*, 846 F.2d at 1393. Accordingly, we have found sufficient evidence of the "knowledge" element of conspiracy not just where the defendant had vague knowledge that the person with whom he or she dealt also worked with unknown others in some fashion to sell drugs, but where the evidence showed that the defendant was "aware of the structure of the enterprise," *United States v. Sobamowo*, 892 F.2d 90, 94 (D.C. Cir. 1989), such as where the defendant "played other roles in the conspiracy" and "knew of the collaboration of others," *Tarantino*, 846 F.2d at 1393-94. A reasonable jury could conclude that the evidence against Johnson and Marbury in this case satisfied those standards.

D

Defendant Earl Edelin argues that the evidence is insufficient to support his conviction for conspiracy to participate in a racketeer-influenced corrupt organization in

violation of 18 U.S.C. § 1962(d). As predicate racketeering acts, the jury found that Earl Edelin had conspired to distribute drugs and to murder members of the Stanton Terrace Crew. Earl Edelin contends that the Government failed to prove his involvement in those activities. As we have discussed, the record contains plentiful evidence that was more than sufficient for a jury to find that Earl Edelin committed both predicate racketeering acts. We therefore affirm his conviction on the RICO conspiracy charge.

E

Defendant Tommy Edelin challenges his conviction for continuing criminal enterprise in violation of 21 U.S.C. § 848(c). To convict under Section 848, the jury must find the defendant guilty of "1) a felony violation of the federal narcotics law; 2) as part of a continuing series of violations; 3) in concert with five or more persons; 4) for whom the defendant is an organizer or supervisor; 5) from which he derives substantial income or resources." *United States v. Moore*, 651 F.3d 30, 80 (D.C. Cir. 2011) (internal quotation marks omitted). A "continuing series of violations" consists of three or more predicate acts, which may include a drug conspiracy under 21 U.S.C. § 846. *Id.*

Tommy Edelin disputes the sufficiency of the evidence supporting his continuing criminal enterprise conviction on two grounds. First, he raises a statute of limitations argument and contends that the evidence is insufficient to establish that the continuing criminal enterprise continued into the limitations period – that is, continued beyond July 1993. (The original indictment was filed on July 30, 1998, and the offense has a five-year statute of limitations. *See* 18 U.S.C. § 3282(a).) That argument fails because the prosecution had the burden of proving only three or more predicate acts, at

least one of which occurred after July 1993. *See United States v. Soto-Beniquez*, 356 F.3d 1, 28 (1st Cir. 2003). The jury found 11 predicate acts proved, 10 of which occurred after July 1993. The Government plainly met its burden.

Second, Tommy Edelin contends that the evidence fails to show that "the core structure of the alleged enterprise remained intact during the period charged." Defs.' Br. 202. That argument also fails. We have previously rejected the claim that Section 848 requires the Government to prove "the structure of a continuing organization equivalent to a RICO 'enterprise.'" *United States v. Hoyle*, 122 F.3d 48, 51 (D.C. Cir. 1997). Rather, we have recognized that "one can organize events and supervise transitory subordinates without creating an organizational structure." *Id.* The Government must simply "establish that the defendant exerted some type of influence over five other individuals in the course of the criminal enterprise"; it "need not prove that the defendant managed five people simultaneously." *United States v. Rea*, 621 F.3d 595, 602 (7th Cir. 2010) (internal quotation marks omitted); *see also United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002); *Santana-Madera v. United States*, 260 F.3d 133, 140 n.3 (2d Cir. 2001).

The Government presented overwhelming evidence that Tommy Edelin organized or supervised five or more people in committing a series of underlying predicate acts, including his conspiracy to distribute drugs for profit. That evidence includes extensive testimony from cooperating witnesses whom Edelin organized, along with others, for purposes of drug distribution and drug-related murders. Viewed in the light most favorable to the Government, a rational jury could easily have found the essential elements of continuing criminal enterprise beyond a reasonable doubt. We therefore

affirm Tommy Edelin's continuing criminal enterprise conviction.

F

Defendant Marbury challenges the sufficiency of the evidence supporting his convictions under D.C. law for possession of a firearm during a crime of violence, as charged in Counts 70-73. The jury acquitted Marbury of the underlying assaults but convicted him of the firearm charges.

Marbury concedes, as he must, that a jury may find him guilty of possessing a firearm during a crime of violence without convicting him of the underlying offense, "so long as there is evidence in the record to support a conviction of the compound offense." *Ransom v. United States*, 630 A.2d 170, 172 (D.C. 1993). He argues that the evidence is insufficient to prove that he committed the offense of possessing a firearm during a crime of violence.

Multiple cooperating witnesses provided detailed testimony about Marbury's role in the charged assaults, all of which involved shootings directed at the Stanton Terrace Crew. In all but one of the attacks, one of the testifying witnesses had participated in the crime with Marbury. In the remaining instance, that witness testified that Marbury had asked him for help in covering up Marbury's role in the shooting. Another Government witness testified that after that assault, Marbury had asked to trade guns because his gun had a victim's "body" on it. July 2, 2001 Trial Tr. at 12065 (Thomas Sims). According to the witnesses, Marbury carried a firearm during each assault.

Based on that testimony, a rational jury could readily find that Marbury participated in each underlying assault. We

therefore affirm his convictions for possession of a firearm during a crime of violence.

## III

The jury convicted defendant Henry Johnson of violent crime in aid of racketeering activity under 18 U.S.C. § 1959. At trial, the Government presented evidence that Tommy Edelin had ordered one of his lieutenants to kill Stanton Terrace Crew affiliate Edgar Watson. That lieutenant and Johnson shot at Watson and Watson's date, Dionne Johnson, as they were leaving a high school prom. Watson died in the attack. The jury found Johnson guilty of violent crime in aid of racketeering activity against Dionne Johnson but acquitted him of the same charge against Watson.

First, Johnson argues that the evidence is insufficient to support the conviction for violent crime in aid of racketeering activity. Because Johnson did not raise that argument in the District Court, our review is for plain error. "When reviewing a sufficiency-of-the-evidence challenge for plain error, we reverse only to prevent a manifest miscarriage of justice." *United States v. Spinner*, 152 F.3d 950, 956 (D.C. Cir. 1998) (internal quotation marks omitted). A manifest miscarriage of justice exists "if the record is devoid of evidence pointing to guilt" or "the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Id.* (internal quotation marks omitted).

To convict for violent crime in aid of racketeering activity, the Government must prove that the defendant committed a violent crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to

or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). We have stated that the "motive of maintaining or increasing one's position in an enterprise may be reasonably inferred where the defendant commits the crime in furtherance of enterprise membership or where the defendant knew it was expected of him by reason of his membership in the enterprise." *United States v. Gooch*, 665 F.3d 1318, 1337-38 (D.C. Cir. 2012) (internal quotation marks omitted). That motive may be found, for example, where the defendant "murdered individuals to maintain or increase his own reputation as an enforcer in the enterprise." *Id.* at 1338 (internal quotation marks omitted).

Johnson contends that the Government failed to prove that he received anything of pecuniary value for his assault of Dionne. That argument fails because the evidence is sufficient to show that Johnson sought to achieve a higher position in Tommy Edelin's racketeering organization. A Government witness testified that Tommy Edelin had ordered Watson's murder because Watson had shot at Edelin's lieutenant. Edelin was concerned that if they failed to retaliate, "that would make them look weak" and "would reflect on him." Aug. 1, 2001 Trial Tr. at 16344 (Eric Jones). That testimony indicates that Tommy Edelin expected his associates to violently retaliate against individuals who threatened them, lest their weakness reflect on the entire group. Based on that evidence, a jury could reasonably infer that Johnson hoped to improve his status in the enterprise by assisting with Watson's murder and assaulting Dionne in the process.

Second, Johnson argues that, in any event, he should receive a new trial on the violent crime in aid of racketeering activity and related firearm charges because, he says, his

conviction resulted from jury confusion. The jury asked the District Court whether it must find Johnson guilty of RICO conspiracy in order to convict him of violent crime in aid of racketeering activity. The District Court responded that the "answer to that question is no." Supp. Jury Instructions, No. 98-264 (D.D.C. filed Sept. 21, 2001). Johnson contends that the District Court's answer was too cursory to adequately resolve the jury's confusion.

We have held that if the jury expresses confusion about a jury instruction, the district court "should reinstruct the jury to clear away the confusion." *United States v. Laing*, 889 F.2d 281, 290 (D.C. Cir. 1989). A district court's decision "to limit its response to answering the jury's question, however, should be reversed only if it is an abuse of discretion." *Id.* We find no abuse of discretion where, as here, the initial instructions were correct and the District Court's "response was limited to answering the jury's query and was entirely accurate." *Id.*

IV

Defendant Bryan Bostick appeals his convictions for the Count One drug conspiracy and the Count Three RICO conspiracy. Bostick contends that there is insufficient evidence that he participated in those conspiracies within the five-year statute-of-limitations period – that is, after August 1994. He also argues that the District Court erred by failing to instruct the jury on withdrawal and limitations defenses. We disagree.

Conspiracy has a five-year statute of limitations. *See* 18 U.S.C. § 3282(a). Bostick claims that he withdrew from the charged conspiracies in April 1994, more than five years

before the Government obtained an indictment against him on August 5, 1999.

The Supreme Court considered "the intersection of a withdrawal defense and a statute-of-limitations defense" in *Smith v. United States*, 133 S. Ct. 714, 718, slip op. at 3 (2013). The Court stated that participation in a conspiracy "*within the statute-of-limitations period* is not an element of the conspiracy offense" that requires proof beyond a reasonable doubt. *Id.* at 720, slip op. at 6. Rather, "a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it." *Id.* at 721, slip op. at 8. The defendant has the burden of establishing his or her withdrawal. *Id.* at 719, slip op. at 3-4. To withdraw from a conspiracy, an individual must come clean to the authorities or communicate his or her abandonment "in a manner reasonably calculated to reach co-conspirators." *United States v. Thomas*, 114 F.3d 228, 267 (D.C. Cir. 1997) (internal quotation marks omitted).

Bostick did not present sufficient evidence of withdrawal. A Government witness testified in passing that Bostick had worked with one of Tommy Edelin's rivals. But the witness did not suggest that working with Tommy Edelin's rival required Bostick to withdraw from the Edelin conspiracy. Moreover, when the witness made that comment, Bostick made no attempt to develop a withdrawal defense. Rather, Bostick's attorney chastised the witness for "blurting out" irrelevant information about his client. May 23, 2001 Trial Tr. at 6051 (Cary Clennon).

Bostick also contends that his conspiracy convictions must be reversed because the District Court failed to instruct the jury on Bostick's supposed withdrawal from the

conspiracy in 1994.  Because Bostick did not request such an instruction at trial, we review for plain error.  *United States v. Gatling*, 96 F.3d 1511, 1524-25 (D.C. Cir. 1996).  Under that standard, Bostick must show "(1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Gooch*, 665 F.3d 1318, 1332 (D.C. Cir. 2012).  The District Court did not err, let alone plainly err, by failing to instruct the jury on withdrawal.  As we have discussed, Bostick did not produce evidence substantiating his claim of withdrawal at any point, let alone in or before 1994.

V

All of the defendants challenge the District Court's jury instructions on the Count One drug conspiracy.  The District Court inadvertently omitted a sentence that the parties had agreed to include in the instructions.  That sentence, in the defendants' view, would have underscored that the Government must prove each individual defendant's involvement in the conspiracy.  At the time, no one objected to the omitted sentence.  On appeal, the defendants maintain that without that sentence, the instructions permitted the jury to convict all of the defendants on Count One as long as the jury found that any two of the defendants had participated in the conspiracy.

Because the defendants did not object to the District Court's omission, our review is for plain error.  *United States v. Gaviria*, 116 F.3d 1498, 1509 (D.C. Cir. 1997).  Under that standard, we reverse only if the defendants show "(1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it

seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gooch*, 665 F.3d 1318, 1332 (D.C. Cir. 2012). We conclude that the instructions adequately conveyed that an individual defendant must join the conspiracy to be found guilty under 21 U.S.C. § 846. There was no error, much less plain error.

The District Court instructed the jury that it "must consider separately the issue of each defendant's participation." Sept. 13, 2001 Trial Tr. at 21521. According to the instructions, the elements of the conspiracy require "that the government prove beyond a reasonable doubt that a particular defendant was aware of the common purpose, had knowledge that the conspiracy existed, and was a willing participant with the intent to advance the purposes of the conspiracy." *Id.* at 21523. It further cautioned the jury that before determining "that a defendant has become a member of a conspiracy, the evidence in the case must prove to you beyond a reasonable doubt that the defendant knowingly participated in the unlawful plan with the intent to advance or further some objective or purpose of the conspiracy." *Id.* The court added that "a person who has no knowledge of or intent to join the conspiracy, but just happens to act in a way that is of benefit to the conspiracy, or to a conspirator, does not thereby himself become a conspirator." *Id.* at 21523-24.

The District Court's instructions repeatedly emphasized that to convict a particular defendant of Count One, the jury must find that the individual defendant knowingly participated in the conspiracy with the specific intent to further its objectives. The omitted sentence would have underscored the point, but the omission of the sentence did not render the instructions erroneous.

22

VI

Defendants Bryan Bostick, Henry Johnson, and Shelton Marbury contend that a number of D.C. Code charges were improperly joined to the federal indictment. As a result of the allegedly improper joinder, those defendants argue that the District Court lacked subject matter jurisdiction over the D.C. offenses pursuant to D.C. Code § 11-502(3).

Section 11-502(3) provides that "the United States District Court for the District of Columbia has jurisdiction" of any "offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." We have interpreted "joined" in that context to mean "properly joined" under Federal Rule of Criminal Procedure 8. *United States v. Gooch*, 665 F.3d 1318, 1334 (D.C. Cir. 2012). We review a claim of improper joinder de novo. *See id.* at 1335.

Federal Rule of Criminal Procedure 8(b) provides that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The D.C. offenses, therefore, were properly joined as long as the federal and D.C. law offenses formed part of the same "series of acts or transactions." A "series of acts or transactions" is "two or more acts or transactions connected together or constituting parts of a common scheme or plan." *United States v. Moore*, 651 F.3d 30, 69 (D.C. Cir. 2011) (internal quotation marks omitted).

Joinder analysis "does *not* take into account the evidence presented at trial," but rather "focuses solely on the indictment and pre-trial submissions." *Gooch*, 665 F.3d at

1334. The Government, therefore, "need merely allege, not prove, the facts necessary to sustain joinder." *Id.* If the indictment satisfies the requirements of Rule 8(b), "trial evidence cannot render joinder impermissible and is thus irrelevant to our inquiry." *Moore*, 651 F.3d at 69.

In this case, the superseding indictment alleged that the D.C. offenses were committed in furtherance of the charged drug conspiracy or were predicate acts committed in furtherance of the charged RICO conspiracy, or both. We have held that when an indictment alleges that local offenses were committed in furtherance of a federal drug conspiracy or as predicate acts in a federal RICO conspiracy, the local and federal offenses were "part of a common scheme or plan" and thus were properly joined under Rule 8(b). *Id.* The defendants contend that the evidentiary record disproves any connection between the local offenses and the federal conspiracies. We reject that contention. But even if the defendants were correct, the evidence presented at trial is irrelevant to a determination of proper joinder. *See id.*; *Gooch*, 665 F.3d at 1334.

Because the indictment alleged that the local and federal offenses were committed as part of a common scheme or plan, the District Court properly exercised jurisdiction pursuant to Section 11-502(3).

24

VII

The defendants raise two main issues concerning the testimony of FBI Agent Dan Sparks.

A

The Government called FBI Agent Sparks as its first witness at trial. Agent Sparks provided overview testimony about the law enforcement investigation of the defendants. That testimony lasted only about an hour, in a trial that lasted five months and had dozens of witnesses testify, including numerous cooperators who testified about their involvement in the organization.

The defendants contend that the District Court erred by admitting Agent Sparks's overview testimony. Based on decisions of this Circuit that came down after the trial, the Government concedes that some aspects of Agent Sparks's testimony exceeded the permissible uses of overview testimony. The Government argues, however, that the admission of Agent Sparks's testimony was harmless error under Rule 52(a) of the Federal Rules of Criminal Procedure. We agree.

First, Agent Sparks testified as a lay witness about general investigative techniques. He discussed the use of controlled buys, search warrants, and cooperating witnesses as general techniques for infiltrating drug organizations. Agent Sparks also described the difficulty of conducting surveillance on criminals who conceal their illegal activities. Based on our recent precedents, admission of those statements as lay opinion testimony was error. *See United States v. Moore*, 651 F.3d 30, 61 (D.C. Cir. 2011); *see also* Fed. R. Evid. 701. However, the District Court later qualified Agent

Sparks as an expert in the investigation of drug trafficking based on his "training and experience on hundreds of investigations." Aug. 13, 2001 Trial Tr. at 17649. Because Agent Sparks would have qualified as an expert for purposes of the challenged testimony, there was no prejudice from that particular error. *See Moore*, 651 F.3d at 61 (that Agent Sparks "might have qualified as an expert" ameliorated prejudice from improper opinion testimony); *see also United States v. Smith*, 640 F.3d 358, 366 (D.C. Cir. 2011) (agent's improper lay testimony was harmless error where agent would have qualified as an expert).

Second, Agent Sparks testified that violence in the Stanton Dwellings neighborhood had prompted the investigation in this case. When asked about the cause of the violence, Agent Sparks testified: "They were predominantly selling narcotics, and the narcotics was fueling the violence." May 9, 2001 Trial Tr. at 4179. The Government concedes that Agent Sparks's statement linking the violence to drug trafficking was inadmissible. *See* Fed. R. Evid. 403, 602, 701, 802. Though inadmissible, the challenged testimony was harmless error in this case. There was overwhelming evidence that the defendants committed violence, including numerous murders, in furtherance of the drug distribution conspiracy.

Third, Agent Sparks testified about the Government's use of cooperating witnesses. Agent Sparks repeatedly asserted that law enforcement verifies the information cooperators provide and requires truthful testimony as a condition of their plea agreements. As the Government concedes, Agent Sparks's testimony impermissibly suggested "that the government had selected only truthful co-conspirator witnesses for the pre-indictment investigation, from whom the jury would hear during the trial." *Moore*, 651 F.3d at 59-60.

Such vouching testimony "is impermissible because it manifests the obvious danger that a jury will treat a summary witness, particularly a government agent," as "additional evidence or as corroborative of the truth of the underlying testimony." *United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013) (quoting *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983)) (internal quotation marks omitted); *see also Moore*, 651 F.3d at 59-60; Fed. R. Evid. 403, 608(a).

Under our precedents, however, that testimony was harmless error. At the close of trial, the District Court instructed the jury: "You are the sole judge of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and the extent to which any witness should be believed." Sept. 13, 2001 Trial Tr. at 21499. In *United States v. Miller*, we held that an identical jury instruction mitigated prejudice from improper vouching testimony. 738 F.3d at 372. In addition, the defendants here cross-examined Agent Sparks, and he acknowledged the limits on verifying cooperator testimony. Agent Sparks agreed, for example, that cooperating co-conspirators had "flat out lied" to law enforcement in the past. May 9, 2001 Trial Tr. at 4421-22. He also agreed that law enforcement cannot always verify cooperators' information. *Cf. Miller*, 738 F.3d at 372 (impeachment of cooperating witnesses on cross-examination mitigated prejudice from vouching testimony). The well-rounded picture that Agent Sparks ultimately presented about cooperating witnesses mitigated any risk of prejudice from his initial testimony on that point.

Fourth, Agent Sparks discussed some of the evidence that was later admitted at trial. Some of that testimony violated the hearsay rule. *See* Fed. R. Evid. 602, 701, 802. But the error was harmless because that testimony – to the extent it related to charged offenses – was confirmed through several

months of testimony from dozens of witnesses, including numerous cooperating witnesses.

As this Court has stated before, aspects of overview testimony can be problematic under the Federal Rules of Evidence. But in the big picture of this trial – which lasted many months and included massive amounts of testimonial evidence – the overview testimony was relatively minor. To the extent it exceeded the bounds of the Federal Rules of Evidence, Agent Sparks's overview testimony was harmless error. It did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *see also Smith*, 640 F.3d at 366, 368.

B

During the trial, the District Court admitted several audiotapes and videotapes of conversations between Tommy Edelin and Kenneth Daniels, a confidential informant. The conversations concerned a drug transaction. Daniels sold Edelin heroin and cocaine in a government sting operation. But the Government did not call Daniels as a witness at trial. Instead, the Government introduced audiotapes and videotapes of the conversations between Edelin and Daniels, and Agent Sparks testified about those recorded conversations. Edelin challenges the admission of the audiotape and videotape evidence on Confrontation Clause grounds. He also argues that Agent Sparks's testimony about the recorded conversations violated the Federal Rules of Evidence.

First, Tommy Edelin contends that the admission of Daniels's statements on the tapes violated the Confrontation Clause of the Sixth Amendment because Edelin was not able

to cross-examine Daniels. The Sixth Amendment's Confrontation Clause generally bars the introduction of testimonial statements of a witness absent from trial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). The Supreme Court has stated, however, that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 60 n.9. Daniels's recorded statements were not introduced for their truth but rather to provide context for Edelin's statements regarding the transaction. The Government could not have introduced Daniels's statements for their truth because, as Agent Sparks confirmed, Daniels "was lying to Mr. Edelin during these conversations." Aug. 13, 2001 Trial Tr. at 17729. As the Government points out, "Daniels was not, as he represented on the tapes, actually arranging to sell drugs to [Edelin] obtained from a New York drug supplier, but rather acting as a [confidential informant] offering drugs actually supplied by law enforcement agents in a government sting operation." Gov't Br. 115-16. Because Daniels's statements were not offered for their truth, the admission of the tapes did not violate the Confrontation Clause.

Second, Tommy Edelin argues that Agent Sparks's expert testimony about the recorded conversations contravened the Federal Rules of Evidence. Agent Sparks testified as an expert about Edelin and Daniels's negotiations over the sale of drugs. Edelin's basic claim is that Agent Sparks improperly translated the recorded conversations by interpreting ambiguous statements in an incriminating light. He argues that, as a result, Agent Sparks's testimony went beyond the scope of proper expert testimony and greatly prejudiced Edelin.

Assuming for the sake of argument that Agent Sparks's testimony exceeded proper expert testimony, any error was harmless, especially given the overwhelming evidence against Tommy Edelin.

The only close call with respect to harmless error concerns Tommy Edelin's convictions on Counts 86-88 for using a communication device (i.e., a phone or pager) to facilitate the Count One conspiracy to distribute drugs. There is no question that Edelin used a phone or pager to communicate with Daniels about the drug deal. The only issue is whether he did so in furtherance of the drug conspiracy charged in Count One. Put simply, Agent Sparks's testimony could not have meaningfully influenced the jury's thinking on that question, because Agent Sparks mentioned the Count One drug conspiracy only in passing in response to a question on cross-examination.

The record, moreover, contains plentiful evidence that Tommy Edelin was acting in furtherance of the drug conspiracy charged in Count One when he used a communication device to communicate with Daniels. On their face, the recorded conversations refer to the group that had been distributing drugs for Edelin. In one call, for example, Edelin told Daniels that he could sell drugs through "10 dudes" that "I trust and that I grew up with that I kicked keys to and still be kicking keys." July 7, 1998 Call Tr. at 6, Joint Appendix at 1315. There was no evidence to support an inference that Edelin had developed some new or different drug distribution network through which he planned to sell the large quantity of drugs purchased from Daniels. Rather, Edelin's reference to a group of "dudes" with whom he grew up selling drugs and with whom he continued to sell drugs was very likely (if not certainly) a reference to his longstanding organization, members of whom had provided

months of testimony about the years they spent distributing drugs for Edelin.

Nor does the record suggest that Tommy Edelin had ended the organization charged in the Count One conspiracy – and started a new one – before his conversations with Daniels. Witnesses testified that as of 1996, Edelin was still directly supplying some mid-level dealers like Thomas Sims and indirectly supplying other mid-level dealers like Henry Johnson in the Stanton Dwellings and Congress Park neighborhoods of Southeast Washington, D.C. Edelin's brother testified that he traveled to New York twice a month during 1997 to purchase large quantities of powder cocaine on Edelin's behalf. He would deliver the drugs to Edelin's recording studio, where Edelin would cook the powder into crack cocaine. When officers searched Tommy Edelin's house the day of his arrest, they found an eighth of a kilogram of powder cocaine and an eighth of a kilogram of crack cocaine.

In short, Tommy Edelin maintains that, absent Agent Sparks's testimony, a jury could have concluded that the conversations with Daniels related to some unknown drug organization distinct from the Count One conspiracy. But there is simply no evidence to support that theory and no reason to believe that the jury would have so concluded had Agent Sparks not testified. And we see no indication that Agent Sparks's testimony had a "substantial and injurious effect" on the jury's conclusion that the Daniels conversations were in furtherance of the Count One conspiracy. *See Kotteakos*, 328 U.S. at 776. Any error with regard to admission of Agent Sparks's testimony about the Daniels tapes was harmless.

## VIII

At trial, the Government presented expert testimony about the autopsies of 10 homicide victims. The experts included two medical examiners for the District of Columbia and a forensic pathologist for North Carolina. Two of the experts testified about autopsies that they had observed but had not performed. The remaining expert testified about eight autopsies that he had neither performed nor observed. The experts discussed information in the victims' autopsy reports and opined on the manner of the victims' deaths.[1]

The defendants contend that the Confrontation Clause of the Sixth Amendment barred the admission of the autopsy reports and accompanying expert testimony. The Sixth Amendment bars the introduction of testimonial statements of a witness absent from trial unless the witness is unavailable, and the defendant has had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). The defendants argue that the autopsy reports were testimonial statements under the Confrontation Clause. They maintain that the introduction of those statements violated the Confrontation Clause because the defendants did not have an opportunity to cross-examine the medical examiners who actually performed the autopsies and authored the reports.

Because the defendants did not preserve their constitutional objection at trial, our review is for plain error. Under that standard, the defendants must show "(1) that there was an error, (2) that the error was clear or obvious, (3) that it

---

[1] The Government also presented testimony about the autopsy of an eleventh homicide victim that is not at issue here. The expert who testified about that autopsy had conducted the examination.

affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gooch*, 665 F.3d 1318, 1332 (D.C. Cir. 2012). Substantial rights were affected if "the error was prejudicial and actually affected the outcome below." *United States v. Gatling*, 96 F.3d 1511, 1525 (D.C. Cir. 1996). The "plainness" of an error is evaluated at the time of appellate review, not at the time of the district court's decision. *See Henderson v. United States*, 133 S. Ct. 1121, 1129, slip op. at 9 (2013).

Based on Supreme Court decisions issued after the trial in this case, we will assume without deciding that the autopsy reports were "testimonial" for purposes of the Confrontation Clause. *See Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).[2] However, any error arising from their admission did not affect the defendants' substantial rights in light of the overwhelming evidence against them. Put simply, the autopsy reports did not play an important role in the trial. The Government presented other evidence at trial, including testimony from cooperating witnesses, that nine of the ten homicides resulted from gunshot wounds inflicted by members of the charged conspiracy, and that Tommy Edelin hired hitmen to carry out the tenth murder. Moreover, there

---

[2] In *United States v. Moore*, 651 F.3d 30, 72-73 (D.C. Cir. 2011), we held that autopsy reports are testimonial under certain circumstances based on the Supreme Court's decisions in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011) and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). *Moore* came down before the Supreme Court's decision in *Williams v. Illinois*, 132 S. Ct. 2221 (2012). We need not decide here whether or how *Williams* affects the analysis of autopsy reports as testimonial. As we explain, assuming the reports were testimonial, their admission was harmless error.

was no dispute at trial that gunshots killed each victim. As the Government aptly stated in its brief, the "issue that was in material dispute – who pulled the trigger(s) – was not addressed by any of the testifying medical examiners." Gov't Br. 158. There was no plain error in admitting the autopsy reports.

IX

Defendants Bryan Bostick and Tommy Edelin attempted to introduce expert testimony at trial. Bostick sought to present testimony from a gang expert, and Tommy Edelin sought to present testimony from an expert in FBI investigative techniques. The District Court excluded that testimony. The defendants now appeal the District Court's rulings.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The rule provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four conditions are met: First, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Second, "the testimony is based on sufficient facts or data." Third, "the testimony is the product of reliable principles and methods." And fourth, "the expert has reliably applied the principles and methods to the facts of the case."

We have stated that a "district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when discretion has been abused." *United States v. Clarke*, 24 F.3d 257, 268 (D.C. Cir. 1994) (internal quotation marks omitted). The District Court did not abuse its discretion here.

A

Bostick proffered testimony from Lisa Taylor-Austin, "an expert on gang culture and violence." Aug. 28, 2001 Trial Tr. at 20173. Taylor-Austin would have opined "that the so-called gangs referenced in the government case do not fit the typical profile or operational structure of gangs as they are typically understood by the law enforcement community." *Id*. Defendants Henry Johnson and Tommy Edelin joined Bostick's request to admit the expert. They argued that the prosecution had attempted to portray Tommy Edelin's criminal organization as a "crew" or "gang," and that information on gang formation was therefore relevant. *Id.* at 20179-80.

The Government objected on the ground that it was irrelevant whether Tommy Edelin's organization constituted a gang. None of the charges involved gang membership, and the Government was not arguing that the defendants belonged to a gang. Rather, the question for the jury was whether the defendants had participated in drug and racketeering conspiracies. The District Court found the proffer "inadequate" and sustained the Government's objection. *Id.* at 20180.

The District Court did not abuse its discretion. The defendants failed to show how gang formation was relevant to the charged drug and racketeering conspiracies. The elements of those offenses do not include gang membership. *See* 21 U.S.C. § 846; 18 U.S.C. § 1962(d). The Government, moreover, made no attempt to prove that the defendants were gang members. The District Court therefore acted within its discretion by concluding that the proffered testimony would

not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

B

Tommy Edelin sought to present expert testimony from Dr. Tyrone Powers, a former FBI special agent. The proffer explained that Powers would "rebut" FBI Agent Dan Sparks's testimony regarding cooperating witnesses. Aug. 20, 2001 Trial Tr. at 18846. In particular, the expert would address departures from "standard FBI procedure with the handling of a number of co-conspirators in terms of the inducements that they were provided, the fact that they were permitted to continue to engage in criminal activity," and the level of surveillance over their activities. *Id.* The Government objected that it would be improper for an expert witness to opine "about how the FBI may have conducted or didn't conduct its investigation in this case." *Id.* at 18847. The District Court agreed with the Government and refused to admit the testimony.

The District Court did not abuse its discretion in excluding Powers's testimony. Federal Rule of Evidence 702 provides that expert testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods." Tommy Edelin's proffer failed to clarify the basis for and reliability of Powers's testimony regarding perceived errors in the Government's investigation, in which Powers took no part. Nor did Edelin explain how such testimony would help the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In short, Edelin failed to meet the basic requirements of Rule 702. The District Court did not abuse its discretion in excluding that testimony.

X

During and after the trial, the defendants alerted the District Court to the possibility of juror misconduct. In the first instance, the District Court instructed the jury regarding appropriate conduct for jurors. In the second instance, which the defendants brought to the court's attention after the trial, the District Court held two hearings in order to investigate the allegations of improper influence on the jury. On appeal, the defendants challenge how the District Court handled both matters.

A

Following the introduction of autopsy pictures, defendant Bryan Bostick's attorney alerted the District Court that she had noticed a juror looking "repulsed" and communicating non-verbally with the juror next to her. July 25, 2001 Trial Tr. at 15175 (Diane Savage). The District Court instructed the members of the jury not to discuss the case with one another or to express views about the evidence in any way with one another. The next day, Bostick's attorney reported that she saw the jurors repeat their non-verbal exchange.

A few days later, the District Court informed counsel that some jurors had told the marshals that they were "nervous" because the defendants, and in particular Bostick, had been staring at the jurors. The marshals told the jurors that "if the defendant doesn't say anything or mouth anything, it doesn't mean anything, that different people just look differently." July 30, 2001 Trial Tr. at 15810-11. An alternate juror had also asked the marshals what to "do if one of the defendants looks like he's fallen in love with you," apparently in reference to Bostick. *Id.* at 15811. Using stronger language submitted by Bostick's counsel, the District Court again

instructed the members of the jury to refrain from verbal or non-verbal discussion of the case with one another.

Several days later, the District Court notified counsel that the jury had complained to a marshal about that instruction. The District Court apologized to the jury for "any confusion" and explained that non-verbal communication refers to the expression of "opinion about the facts or the evidence in the case." Aug. 6, 2001 Trial Tr. at 16732.

Bostick asked the court to individually question all of the jurors to confirm their impartiality. Each of the other defendants opposed that request, and the court denied it. Bostick then moved to sever his trial from that of his co-defendants. The District Court denied that motion. On appeal, Bostick maintains that the District Court erred by denying his request for a mid-trial voir dire and denying his motion for severance.

First, Bostick maintains that the District Court abused its discretion by refusing to conduct a voir dire of each juror to determine each juror's impartiality. We afford the District Court "especially broad discretion to determine what manner of hearing, if any, is warranted about intra-jury misconduct." *United States v. Williams-Davis*, 90 F.3d 490, 505 (D.C. Cir. 1996) (internal quotation marks omitted). Unlike external influences on a jury, evidence of intra-jury communications and influences "is not competent to impeach a verdict." *United States v. Wilson*, 534 F.2d 375, 379 (D.C. Cir. 1976) (internal quotation marks omitted); *see also Williams-Davis*, 90 F.3d at 505 (When "there are premature deliberations among jurors with no allegations of external influence on the jury, the proper process for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its

ultimate decision only on evidence formally presented at trial.") (internal quotation marks omitted).

Under the circumstances here, we see no basis for saying that the District Court had to do more. Indeed, all of the defendants except Bostick opposed a mid-trial voir dire on the ground that it would alienate the jury and would not produce useful information. The District Court did not abuse its discretion when it declined to conduct a mid-trial voir dire of the jury.

Second, Bostick asserts that the District Court's denial of his motion for severance compromised his right to an unbiased jury. Federal Rule of Criminal Procedure 14 authorizes a court to sever a joint trial if joinder appears to prejudice a defendant or the Government. There must be "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). There was no such serious risk here. We affirm the denial of Bostick's motion for severance.

B

Eleven months after the verdict, Alternate Juror 2 ran into defense counsel for Tommy Edelin and Bostick and informed them of alleged juror misconduct during the trial. Alternate Juror 2 claimed that a courtroom marshal had an inappropriate personal relationship with Juror 7. In addition, Alternate Juror 2 said that after her discharge, the marshal told her that Bostick had confessed to a charged murder. Alternate Juror 2 did not participate in the jury's deliberations, but she later stated that she believed she had shared the information about

Bostick with deliberating Juror 2269 before the verdict was reached.

Defense counsel notified the District Court of Alternate Juror 2's allegations. The District Court then held two hearings. During those hearings, the District Court questioned Alternate Juror 2, Juror 7, and Juror 2269. Attorneys for the defendants attended and suggested questions for the District Court to ask. After the hearings, the defendants filed motions requesting the court to examine the marshal and the remaining jurors. In a detailed opinion, the District Court denied the motions for further investigation on the ground that Alternate Juror 2's allegations were not credible. *United States v. Edelin*, 283 F. Supp. 2d 8 (D.D.C. 2003). The defendants challenge that ruling.

We review the District Court's "choice of procedures to investigate the alleged juror misconduct for abuse of discretion." *United States v. White*, 116 F.3d 903, 928 (D.C. Cir. 1997). The District Court's factual findings "are entitled to great weight, and in the absence of new facts ought not to be disturbed unless manifestly unreasonable." *Id.* (internal quotation marks and alteration omitted).

In its memorandum opinion denying the defendants' motions for further investigation, the District Court set forth detailed findings in support of its conclusion that Alternate Juror 2's allegations lacked credibility.

First, the District Court found that Alternate Juror 2 had "an incentive to discredit" the marshals, "with whom she had not had a good relationship" during the trial. *Edelin*, 283 F. Supp. 2d at 16. Alternate Juror 2 believed that the marshals had criticized her conduct as a juror. She speculated in her testimony that their criticism was the reason she was not

called back to deliberate with the jury. The District Court concluded that Alternate Juror 2's apparent "hostility toward the Marshals" gave her a reason "to seek to undermine the jury's verdict." *Id.*

Second, the District Court found no evidence supporting the allegation that Juror 7 had an improper relationship with the marshal in question. Alternate Juror 2 admitted during her testimony that she had "no real proof" supporting this allegation. *Id.* at 17 (quoting June 27, 2003 Hearing Tr. at 10) (internal quotation marks omitted). Moreover, Juror 7 emphatically denied having any kind of personal relationship with the marshal and testified that they never discussed the trial. Juror 2269 corroborated Juror 7's testimony, stating that she never witnessed any inappropriate contact between jurors and marshals. The District Court concluded that Alternate Juror 2 had based her allegation on unsubstantiated "rumor, inference, and suspicion." *Id.*

Third, the District Court found Alternate Juror 2's second allegation – that the marshal told her that Bostick had confessed to a murder – similarly not credible. Alternate Juror 2 herself testified that "the Marshals didn't say a lot to us." *Id.* (quoting June 27, 2003 Hearing Tr. at 14) (internal quotation marks omitted). In addition, as noted above, Alternate Juror 2 indicated that she did not have a good relationship with the marshal during the trial. In light of this testimony, the District Court concluded that it was "unlikely that the Deputy Marshal would discuss the case in such an open and conversational manner with Alternate Juror 2 at any time." *Id.* at 18.

Moreover, even if the marshal made the alleged comment to Alternate Juror 2, the District Court concluded that there was no evidence that the comment contaminated the jury.

Alternate Juror 2 alleged that the incident took place after her discharge, and she did not participate in the jury's deliberations. And the District Court found no evidence supporting Alternate Juror 2's claim that she may have repeated the alleged comment to Juror 2269 while the jury was deliberating. Juror 2269 emphasized that she had not spoken with Alternate Juror 2 at any point during the jury's deliberations. Juror 2269 also "testified emphatically" that Alternate Juror 2 had never informed her of Bostick's alleged confession. *Id.* at 19. The District Court compared Juror 2269's consistent testimony with Alternate Juror 2's testimony and concluded that "Juror 2269 is the more credible witness on this point." *Id.*

The defendants maintain that the District Court abused its discretion by crediting the testimony of Juror 7 and Juror 2269. They argue that both jurors were implicated in Alternate Juror 2's allegations and thus had an incentive to deny any misconduct. Rather than relying on Juror 7 and Juror 2269's testimony, the defendants contend, the District Court should have questioned the other jurors and the marshal. In addition, the defendants argue that the District Court should have requested Alternate Juror 2's and Juror 2269's phone records in order to establish whether they spoke during the jury's deliberations.

That argument lacks merit. "We have explicitly rejected any automatic rule that jurors are to be individually questioned" about alleged misconduct. *Williams-Davis*, 90 F.3d at 499. And we have stated that when questioning jurors about an alleged improper contact, a judge is "entitled to rely on their testimony if he found it credible." *United States v. Butler*, 822 F.2d 1191, 1197 (D.C. Cir. 1987); *see also id.* (Jurors' assurances of impartiality are "*not* inherently suspect, for a juror is well qualified to say whether he has an unbiased

mind in a certain matter.") (quoting *Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982)) (internal quotation marks omitted); *United States v. Gartmon*, 146 F.3d 1015, 1029 (D.C. Cir. 1998) ("The district court, having observed the demeanor of the juror, is in the best position to determine the credibility" of the juror's assurance "that the contact would not influence him.").

Here, the District Court had broad discretion to determine how to investigate Alternate Juror 2's allegations, and we must give the District Court's factual findings regarding juror misconduct "great weight" on review. *White*, 116 F.3d at 928. After conducting two hearings, the District Court carefully analyzed the jurors' testimony, made detailed credibility assessments, and set forth factual findings supported by the record. The court was well within its discretion to conclude that there was insufficient evidence substantiating the allegations. Juror 7 and Juror 2269 consistently denied the alleged misconduct and corroborated each other's testimony. In contrast, Alternate Juror 2 admitted that she had no proof of Juror 7's inappropriate relationship with the marshal. Where, as here, "the allegation of an improper communication was countered by substantial evidence that no such communication had occurred," the District Court "was not required to pursue the matter any further." *Id.* at 929.

We will not disturb the District Court's well-supported determination that the alleged improper juror activity did not occur.

## XI

At the conclusion of the first post-verdict hearing on juror misconduct, Tommy Edelin moved for the District Court

judge to recuse. Edelin allegedly had observed the judge "lead the witness" by "subtly shaking his head across in a no gesture or up and down in a yes gesture as the question was being responded to by the juror." June 27, 2003 Hearing Tr. at 50. The District Court denied the motion for recusal. At the start of the second post-verdict juror hearing, Edelin renewed his motion and added another ground for recusal: the judge's "longstanding professional relationship" with the marshal implicated in the allegations of improper juror activity. July 11, 2003 Hearing Tr. at 3-4. The District Court again denied the motion.

On appeal, the defendants submit that the judge had an obligation to recuse himself from adjudication of the juror misconduct allegations pursuant to 28 U.S.C. § 455(a) and § 455(b)(1). We review a district court judge's refusal to recuse for abuse of discretion. *SEC v. Loving Spirit Foundation Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004).

Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Under that provision, "a showing of an *appearance* of bias or prejudice sufficient to permit the average citizen reasonably to question a judge's impartiality is all that must be demonstrated to compel recusal." *United States v. Heldt*, 668 F.2d 1238, 1271 (D.C. Cir. 1981).

The defendants argue that any reasonable observer would question the impartiality of a judge who is telegraphing answers to a testifying juror. We do not disagree with that general statement. But apart from Tommy Edelin's unsubstantiated allegation, there was no evidence that the judge was in fact leading the juror through the judge's body language or demeanor. As the Government points out, only Edelin "claimed to have witnessed this behavior; no one else

corroborated his claim," including Edelin's own attorneys. Gov't Br. 205. Nor did any other defendant join Edelin's motion for recusal. The utter lack of corroboration is significant given that numerous attorneys and defendants were present at the hearing.

Section 455(b)(1) provides that a judge "shall also disqualify himself" where "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

The defendants contend that the judge's longstanding relationship with the marshal required the judge to recuse under Sections 455(a) and (b)(1). The Government maintains that Tommy Edelin's recusal motion on that ground was untimely because he raised the issue only at the court's second hearing on juror misconduct. We need not resolve the timeliness question. Assuming for the sake of argument that the motion was timely, we conclude that the District Court did not abuse its discretion in denying recusal.

The defendants acknowledge that "a duty to recuse does not arise simply because a case involves a marshal with whom a judge has no special relationship." Defs.' Br. 112. The defendants therefore argue that the judge and the marshal had a special relationship: The marshal "was the chief marshal assigned to the courtroom providing protection to both the judge and jury." Defs.' Br. 113-14. But there is no evidence that the judge and marshal's interactions amounted to anything more than ordinary contact incident to their respective courtroom roles. In short, the mere fact that the judge and the marshal interacted in the course of performing their respective duties is insufficient to create a reasonable question regarding the judge's impartiality. *See United States v. Faul*, 748 F.2d 1204, 1211 (8th Cir. 1984) ("Assuming that

the deceased marshals did have contact with the court by providing security, it does not follow that the judge had a professional or personal relationship with either marshal sufficient to demonstrate personal prejudice bias.") (internal quotation marks omitted); *United States v. Sundrud*, 397 F. Supp. 2d 1230, 1236 (C.D. Cal. 2005) ("a casual relationship with a victim officer who provides court security does not require recusal").

The defendants failed to carry their burden of establishing the appearance or existence of judicial bias. The District Court judge did not abuse his discretion by denying the motion to recuse.

XII

Four months into the trial, Tommy Edelin raised concerns to the District Court regarding his lead counsel, James Rudasill. The court had appointed Rudasill and two other attorneys, Pleasant Brodnax and William Kanwisher, to represent Edelin. Edelin informed the court that he distrusted Rudasill's ability to represent his interests and complained about a lack of cohesion in his defense team. Over a 10-day period, Edelin made several requests to the District Court to remove Rudasill. Because the District Court determined that Rudasill had not "done anything wrong or committed any misconduct," the court declined to discharge him. Aug. 16, 2001 Bench Conference Tr. at 4.

Tommy Edelin now argues that the District Court's refusal to discharge Rudasill violated Edelin's right to the assistance of counsel. He says that in seeking to remove Rudasill, he did not wish to proceed pro se but rather to proceed with Brodnax and Kanwisher as his attorneys. We review the denial of a motion to replace court-appointed

counsel for abuse of discretion.  *See United States v. Graham*, 91 F.3d 213, 221 (D.C. Cir. 1996).

An indigent criminal defendant who seeks court-appointed counsel does not have a constitutional right to choose his attorney; "he has only the right to effective representation."  *Id.* at 217.  Effective representation "may be endangered if the attorney-client relationship is bad enough."  *Id.* at 221.  When a defendant asks the district court to replace appointed counsel, the court "generally has an obligation to engage the defendant in a colloquy" on the record "concerning the cause of the defendant's dissatisfaction with his representation."  *Id.*  The defendant bears the burden of showing good cause to replace appointed counsel, "such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant."  *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991).

Here, the District Court held multiple colloquies on the record in order to determine the reasons for Tommy Edelin's dissatisfaction with Rudasill.  Although Edelin complained of a breakdown in trust and communication, the record does not suggest that the attorney-client relationship had deteriorated to the point where Rudasill could not provide effective assistance of counsel.  Indeed, during the court's final bench conference on the matter, Rudasill reported that he had met with Edelin for several hours the night before in "a frank and productive meeting."  Aug. 16, 2001 Bench Conference Tr. at 4.  Rudasill confirmed that he was able to communicate with and represent Edelin effectively.  Kanwisher, moreover, stated that "the defense itself could be compromised if in fact Mr. Rudasill was to be discharged" and that Rudasill's discharge would render Kanwisher's own representation of Edelin ineffective.  Aug. 9, 2001 Proceeding Tr. at 17601-02.  In

those circumstances, the District Court did not abuse its discretion in denying Edelin's motion to discharge Rudasill.

## XIII

The defendants also challenge their sentences. The defendants were sentenced before the Supreme Court's landmark Sixth Amendment decision in *United States v. Booker*, 543 U.S. 220 (2005). That decision changed the previously mandatory Sentencing Guidelines into advisory Sentencing Guidelines.

At sentencing, two of the defendants (Earl Edelin and Henry Johnson) raised Sixth Amendment objections to the then-mandatory Sentencing Guidelines. On this record, we cannot say with sufficient confidence that the District Court would have imposed the same sentences under the advisory Guidelines. Under *Booker*, Earl Edelin and Johnson are therefore entitled to vacatur of their sentences and to resentencing under the advisory Sentencing Guidelines. Two of the defendants (Bryan Bostick and Shelton Marbury) did not raise the Sixth Amendment issue in the District Court. We must apply the plain error standard. Under that standard, we cannot say with sufficient confidence that the District Court would have imposed the same sentences under the advisory Guidelines. Bostick and Marbury are therefore entitled to what our cases have termed a *Booker* remand of the record to determine whether the District Court would impose different sentences, more favorable to the defendants, under the advisory Guidelines. *See United States v. Coles*, 403 F.3d 764, 770 (D.C. Cir. 2005). The sentence of the remaining defendant, Tommy Edelin, is affirmed. Based on his conviction for continuing criminal enterprise, which we affirm in this decision, Tommy Edelin received a statutorily mandated life sentence. *See* 21 U.S.C.

§§ 848(b)(1), (b)(2)(A). *Booker* deals only with the Guidelines and does not affect Tommy Edelin's sentence, as he has expressly conceded on appeal. *See* Defs.' Br. 262 n.92; *see also United States v. Carson*, 455 F.3d 336, 384 (D.C. Cir. 2006).

In the interest of judicial economy on remand, we will also consider here the remaining four defendants' challenges to the District Court's Guidelines calculations, as the Guidelines still play a role in post-*Booker* sentencing. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

In order to calculate a defendant's sentence under the Sentencing Guidelines, the district court must determine the defendant's "relevant conduct." U.S.S.G. § 1B1.3. In a conspiracy case, relevant conduct includes both acts committed directly by the defendant and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Mellen*, 393 F.3d 175, 182 (D.C. Cir. 2005). The scope of a defendant's jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant" in the conspiracy. U.S.S.G. § 1B1.3 cmt. n.2.

Marbury, Johnson, Earl Edelin, and Bostick maintain that the District Court improperly calculated their Guidelines offense level on the Count One drug distribution conspiracy by holding each of them responsible for distributing the maximum amount of crack cocaine (1.5 kilograms or more) under the 2001 Guidelines, without first making sufficiently particularized factual findings in support of each defendant's relevant conduct.

The problem for the defendants is that the District Court also found each of them responsible for several murders committed in furtherance of the Count One drug conspiracy. Those murders maximized each defendant's offense level (to level 43) under the Guidelines for the Count One conspiracy. Therefore, any error with respect to the drug quantity findings had no impact on the defendants' Guidelines offense level for the Count One conspiracy. The defendants in turn claim that the District Court did not make sufficient findings or otherwise erred in attributing several murders to each of them. But those arguments are entirely without merit, as we will now explain.

First, as to Marbury, the District Court found that "the murders of Anthony Payton, Damien Jennifer, Robert Keys, Sherman Johnson, and Edgar Watson were reasonably foreseeable to defendant Marbury and that he is properly held accountable for these murders as acts in furtherance of the narcotics conspiracy charged in Count One." Defs.' Br. 287. The Sentencing Guidelines provide that a defendant's drug offense level will be increased to the maximum offense level of 43 if "a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111." U.S.S.G. § 2D1.1(d)(1); *see also* U.S.S.G. § 2A1.1(a). The District Court therefore increased Marbury's offense level for the Count One drug conspiracy to 43.

Marbury contends that the District Court failed to make sufficiently detailed or particularized findings that the murders were foreseeable to him and within the scope of his conspiratorial agreement. Although the District Court cited the trial testimony of five named witnesses, Marbury asserts that the court should have cited specific portions of the trial transcript in support of its conclusion. He further protests that the five murders for which he was held responsible were not

committed in furtherance of the Count One drug distribution scheme but rather were part of a separate conspiracy to murder members of the Stanton Terrace Crew. As a result, he argues, the murders should not affect his offense level for the Count One drug conspiracy.

Marbury's arguments are meritless. Marbury directly participated in and was convicted of two of the five murders for which he was held accountable – the killing of Payton and Keys. And as discussed in Part II above, the record amply supports the inference that the violent campaign against the Stanton Terrace Crew (including the murders of Payton and Keys) was undertaken at least in part to further the profits and operations of the Count One drug conspiracy. Applying clear error review to the District Court's findings of fact and giving "due deference" to the District Court's application of the Guidelines to the facts, *see United States v. Fahnbulleh*, 752 F.3d 470, 481 (D.C. Cir. 2014), Marbury's murders of Payton and Keys result in the maximum offense level of 43 for the drug conspiracy.

Second, like Marbury, Johnson objects that the District Court erroneously held him responsible for several murders in furtherance of the Count One drug conspiracy. The District Court applied U.S.S.G. § 2D1.1(d)(1) based on Johnson's convictions for the murder of Payton and for use of a firearm in the murder of Edgar Watson. The application of U.S.S.G. § 2D1.1(d)(1) automatically increased Johnson's offense level for the Count One drug conspiracy to 43, the maximum offense level. Johnson resurrects his sufficiency of the evidence claim, arguing that the Stanton Terrace murders (including the murders of Payton and Watson) comprised a separate conspiracy unrelated to the drug distribution scheme. Given the clear sufficiency of the evidence supporting a contrary conclusion, we uphold the District Court's

conclusion that Johnson's murders of Payton and Watson result in the maximum offense level of 43 for the Count One drug conspiracy.

Third, echoing his co-defendants, Earl Edelin asserts that the District Court erred in holding him accountable for murders in furtherance of the Count One conspiracy. Crediting the trial testimony of six witnesses, the District Court found that ten murders committed by Earl Edelin's co-conspirators were reasonably foreseeable to Earl Edelin and in furtherance of the Count One drug distribution conspiracy. Including those murders in Earl Edelin's relevant conduct automatically results in the maximum offense level of 43. Earl Edelin submits that the District Court erred by failing to cite specific portions of the trial transcript establishing that those murders were both foreseeable to him and within the scope of his particular conspiratorial agreement. But the District Court did adopt findings of fact from the presentence report and, by doing so, made specific findings about Earl Edelin's being a driving force in the violence and in conflicts with rival drug crews. And the record contains overwhelming evidence that the murders fell within Earl Edelin's jointly undertaken criminal activity in furtherance of the Count One conspiracy.

Five of the murders that the District Court counted as relevant conduct (Anthony Payton, Damien Jennifer, Robert Keys, Sherman Johnson, and Edgar Watson), for example, were directed against members of the Stanton Terrace Crew. Although Earl Edelin did not physically participate in those murders, he was directly involved in efforts to kill Stanton Terrace Crew members. As discussed earlier, multiple witnesses testified that Earl Edelin taught his co-conspirators killing techniques to use against the Stanton Terrace Crew, provided guns for use in the shootings, kept tabs on the

conflict, and shared information regarding the whereabouts of Stanton Terrace Crew members. Moreover, the testimony indicates that he did so in order to protect his network's distribution activities and drug sales. In a similar vein, two of the other murders (Arion Wilson and Charles Morgan) for which Earl Edelin was held accountable occurred during an 18-month conflict with another rival drug crew. Witnesses testified that during that dispute, Earl Edelin provided information a few times a week about where members of the enemy crew were located and the cars they were driving. He also supplied his co-conspirators with firearms during the conflict. Given that evidence, the District Court permissibly concluded that those murders were reasonably foreseeable to Earl Edelin and within the scope of his particular conspiratorial agreement. Earl Edelin's accountability for any one of those murders results in the maximum Guidelines offense level of 43 for the Count One drug conspiracy. *See* U.S.S.G. §§ 2A1.1(a), 2D1.1(d)(1).

Fourth, Bostick's challenge to the District Court's calculation of his Guidelines sentence fails for much the same reasons. The jury found Bostick guilty of the first degree murders of Rodney and Volante Smith. In addition, the jury found that both murders were racketeering acts committed in furtherance of the Count Three RICO conspiracy. First degree murder committed as a racketeering act results in the maximum Guidelines offense level of 43. *See* U.S.S.G. §§ 2A1.1, 2E1.1. Bostick maintains that there was insufficient evidence that the Smith murders were committed in furtherance of a conspiracy to participate in a RICO enterprise. But as discussed in Part II above, the record easily supports the conclusion that Bostick committed the murders in order to improve his standing in Tommy Edelin's racketeering and drug distribution conspiracy.

The District Court also found Bostick responsible for the murders of Arion Wilson and Charles Morgan as jointly undertaken criminal activity in furtherance of the Count One drug conspiracy and the Count Three RICO conspiracy. Bostick objects that the District Court failed to explain how those murders were foreseeable to Bostick or within the scope of his conspiratorial agreement. But the District Court explicitly addressed that issue at sentencing. Wilson and Morgan were killed by Bostick's co-conspirator, Thaddeus Foster, during an 18-month feud with an enemy drug crew. Tommy Edelin had ordered his associates to kill the members of the rival crew. In 1994, Bostick, Foster, and another co-conspirator caught sight of a gold van, which they identified as belonging to enemy crew member Kevin Clark. They fired numerous shots at the van's occupants, who survived the attack. A few weeks later, Foster spotted a gold van at a rest stop in North Carolina, which he again identified as Clark's van. Foster shot and killed the van's occupants, Wilson and Morgan. In holding Bostick accountable for those murders, the District Court explained that it "was foreseeable that anyone in this van would be killed if the van was identified as Clark's." June 14, 2004 Sentencing Tr. at 7. Given Bostick's active participation in the conflict and in particular the first attack on a gold van, the District Court did not err by holding him responsible for the Wilson and Morgan murders as jointly undertaken criminal conduct in furtherance of the Count One drug conspiracy and the Count Three RICO conspiracy.

In short, even if the District Court erred in not explaining or justifying the drug quantities attributed to each defendant – an issue we do not decide – none of the defendants can show prejudice from any such error because the murders themselves resulted in the maximum Guidelines offense level of 43, and the District Court made sufficient findings and appropriately explained its conclusions with regard to the murders.

## XIV

Defendants Bryan Bostick, Henry Johnson, and Shelton Marbury appeal the District Court's orders requiring them to pay restitution to the families of their murder victims. The District Court ordered Bostick to pay $4,688 in funeral expenses to the mother of one of his murder victims. It ordered Johnson and Marbury to pay about $18,380 in funeral expenses and lost wage earnings to the mother of one of their victims. And it ordered Marbury to pay $6,589.83 in funeral expenses to the mother of another of his victims. For each of the defendants, the District Court ordered restitution in the amount recommended by the Probation Office in the presentence report. Because the defendants did not object to the restitution orders in the District Court, we review for plain error.

The Mandatory Victims Restitution Act of 1996 provides that a defendant convicted of an offense resulting in the victim's death must "pay an amount equal to the cost of necessary funeral and related services." 18 U.S.C. § 3663A(b)(3). In addition, the defendant must "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4). The court "shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order." *Id.* § 3664(a).

The defendants claim that the District Court erred by adopting the restitution amounts recommended by the

Probation Office without requesting specific computations of those amounts. But as the Government points out, Rule 32(i)(3)(A) of the Federal Rules of Criminal Procedure provides that the sentencing court "may accept any undisputed portion of the presentence report as a finding of fact." The defendants did not dispute the restitution amounts set forth in their presentence reports. As a result, they cannot show that the District Court erred, let alone plainly erred, by ordering restitution in those amounts.

XV

We now touch on several issues that all parties agree require remand. In particular, certain of the defendants' convictions should be vacated or merged, and certain technical or clerical corrections to the judgment should be made.

First, a clerical error: Shelton Marbury's sentence for Count 22 (assault with intent to murder while armed of Darnell Murphy) should be vacated because he was acquitted of that count.

Second, Bryan Bostick's convictions on Counts 64 and 65 (possession of a firearm during a crime of violence under D.C. Code § 22-4504(b)) should merge, and one should be vacated. Under D.C. law, the merger of multiple convictions for possession of a firearm during a crime of violence "is proper if they arose out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Appleton v. United States*, 983 A.2d 970, 978 (D.C. 2009) (internal quotation marks omitted). Because Bostick's convictions on Counts 64 and 65 arose out of his uninterrupted possession of a weapon during the murders of Rodney and Volante Smith, merger is appropriate.

Third, Henry Johnson's and Marbury's convictions on Counts 69 and 70 (possession of a firearm during a crime of violence under D.C. Code § 22-4504(b)) should merge, and one conviction should be vacated for each defendant. The convictions arose out of those defendants' uninterrupted possession of firearms during the murder of Anthony Payton and the assault with intent to murder of Darnell Murphy.

Fourth, Marbury's convictions on Counts 71 and 72 (possession of a firearm during a crime of violence under D.C. Code § 22-4504(b)) should merge, and one should be vacated. Both convictions arose out of Marbury's uninterrupted possession of a firearm during the assault with intent to murder of police officers Kerbin Johnson and Darren Marcus.

Fifth, Johnson's convictions on Counts 56 and 57 should merge, and one should be vacated. Counts 56 and 57 charge the use of a firearm during and in relation to a crime of violence or a drug trafficking crime under 18 U.S.C. § 924(c). Merger is appropriate where multiple convictions under Section 924(c) arise from "only one use of the firearm." *United States v. Wilson*, 160 F.3d 732, 749 (D.C. Cir. 1998). Both of Johnson's convictions on Counts 56 and 57 arose from his single use of a firearm during the murder of Edgar Watson and the attempted murder of Dionne Johnson.

Sixth, Tommy Edelin's conviction of the Count One drug conspiracy should merge into his conviction of the Count Two continuing criminal enterprise. A drug conspiracy under 21 U.S.C. § 846 is a lesser included offense of continuing criminal enterprise under 21 U.S.C. § 848. *See Rutledge v. United States*, 517 U.S. 292, 300 (1996). Because "Congress intended to authorize only one punishment," Edelin's Section

846 conviction, as well as its concurrent sentence, "is unauthorized punishment for a separate offense and must be vacated." *Id.* at 307 (internal quotation marks omitted).

Seventh, Tommy Edelin's judgment should reflect that his convictions on Counts 86, 87, and 88 are for the unlawful use of a communication facility under 21 U.S.C. § 843(b). The judgment lists Counts 86 and 87 under "Possession of a Firearm During a Crime of Violence" and Count 88 under "Distribution of Five Grams or More of Cocaine Base."

Eighth, the "Statement of Reasons" portion of Tommy Edelin's judgment should indicate that the District Court did not waive (due to inability to pay) the $100,000 fine imposed on Edelin. The District Court imposed the fine during its oral delivery of Edelin's sentence. The court did not indicate that the fine would be waived.

\* \* \*

We affirm the judgments of conviction. Under *Booker*, two of the defendants (Earl Edelin and Henry Johnson) are entitled to vacatur of their sentences and to resentencing under the advisory Sentencing Guidelines. Two of the defendants (Bryan Bostick and Shelton Marbury) are entitled to what our cases have termed a *Booker* remand of the record to determine whether the District Court would impose different sentences, more favorable to the defendants, under the advisory Guidelines. The sentence of the remaining defendant, Tommy Edelin, is affirmed. We also remand for the technical corrections noted in Part XV of this opinion.

*So ordered.*